**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )
**ANGELA BRAXTON,**           )
            **Plaintiff,**     )
                                )      **Civil Action No. 07-632**
**v.**                          )      **CKK**
                                )
**DISTRICT OF COLUMBIA,**    )
            **Defendant.**   )
_____)

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Angela Braxton hereby respectfully moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment. In support of her Motion, Ms. Braxton submits the attached Memorandum.

For the reasons stated in the attached Memorandum, the Plaintiff respectfully requests that this Court grant her summary judgment on all claims and issue an order:

1) declaring that the District of Columbia Public Schools ("DCPS") violated the IDEA and denied L.C. free appropriate public education ("FAPE") by failing to perform clinical psychological, psychoeducational, and vocational evaluations of him;

2) ordering the Defendant to fund a clinical psychological evaluation of L.C. at market rate; and

3) ordering DCPS to convene an Individualized Education Program ("IEP") meeting following that evaluation, and at that meeting to update L.C.'s IEP as appropriate and to determine appropriate compensatory education to compensate L.C. for DCPS' violations.

Respectfully submitted,

1

<u>/s/Douglas Tyrka</u>
Douglas Tyrka, #467500
Tyrka & Associates, LLC
1726 Connecticut Ave. NW, Suite 400
Washington, DC  20009
(ph) (202) 265-4260
(f) (202) 265-4264

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **ANGELA BRAXTON,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 07-632** |
| **v.** | ) | **CKK** |
| | ) | |
| **DISTRICT OF COLUMBIA,** | ) | |
| **Defendant.** | ) | |

_____

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Plaintiff, Angela Braxton, brought this case on behalf of her minor son L.C. under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., following an administrative hearing of these same claims. The Hearing Officer denied her any relief and dismissed her case.

Ms. Braxton seeks an order from this Court: 1) declaring that the District of Columbia Public Schools violated the IDEA and denied L.C. free appropriate public education ("FAPE") by failing to perform clinical psychological, psychoeducational, and vocational evaluations of him; and 2) ordering DCPS to fund a clinical psychological evaluation of L.C. and to convene an Individualized Education Program ("IEP") meeting following that evaluation for the purposes of updating L.C.'s IEP and determining appropriate compensatory education to compensate him for DCPS' violations.

### BACKGROUND

Ms. Braxton's son L.C. is a 17-year-old boy whom DCPS has classified as other health impaired ("OHI") as a result of attention deficit hyperactivity disorder ("ADHD").

1

Exhibits 1, 2. DCPS has placed L.C. in Rock Creek Academy, a full-time special education school placement. R. at 2.

At an IEP meeting held on September 26, 2006, the IEP team determined that L.C. was in need of "current academic and cognitive testing," specifically "a vocational, psycho-educational, and clinical evaluation to determine his current level of functioning academically and behaviorally," and developed a Student Evaluation Plan ("SEP") to that effect. R. at 29. Ms. Braxton consented to those evaluations. R. at 29.

DCPS did not complete any of those evaluations before October 31, 2006. On that day, Ms. Braxton filed an administrative "due process complaint notice," alleging that DCPS had failed to conduct and review evaluations of L.C. in all areas of suspected disability, and stating the facts identified above. R. at 7-8.

On November 13, 2006, DCPS served its response to the due process complaint.[1] Exhibit 1. In the response, DCPS stated that it was "attempting to have the psychological,

---

[1] The response in the record filed by the Defendant is not the one in the Plaintiff's possession, which is attached hereto as Exhibit 1. The Plaintiff received DCPS' response on November 13, 2006, via facsimile from Armand Hill, a DCPS paralegal. See Exhibit 1. The response in the record filed by the Defendant appears to have been sent to the Student Hearing Office, as it appears to be date-stamped, and it includes a certificate of service to Plaintiff's counsel, but the Plaintiff does not have a copy in the file. See R. at 10-11.

The two responses differ in several ways. The response in the filed record is dated one day later than the one in the Plaintiff's possession. See Exhibit 1; R. at 10-11. Though each contains a signature line for Aaron E. Price, Sr., the signatures are very different. See id.

Finally, the substance of the November 14, 2006 response is completely different. See id. Unfortunately, it is also false. No evaluations were administered on October 30, 2006. Though there is some indication that the testing portion of a vocational evaluation was performed on October 31, 2006 and November 1, 2006, there is no indication that any evaluation – much less "several" – had been completed by the date of the response. The clinical evaluation has never been completed. DCPS made no representation at the hearing that any evaluations had been completed.

Neither response was discussed at the hearing, so it is unclear, as of the time of the hearing, which of the two contradictory responses DCPS considered to be its true response. The Plaintiff here treats the November 13, 2006 as the only response for two reasons: 1) until reviewing the administrative record as filed by the Defendant, the Plaintiff was only aware of the November 13, 2006 response; 2) as most if not all of the statements of fact in the November 14, 2006 response are false, the Defendant would presumably prefer to treat the November 13, 2006 response as the response.

clinical, and vocational evaluations completed." Id. The response contained no statement or suggestion that the evaluations were not necessary.[2] Id.

A "resolution meeting" was convened on November 28, 2006. R. at 24-27. In its notes of that meeting, DCPS stated: "DCPS agrees to conduct the cognitive psychological, clinical and vocational assessments."[3] R. at 26. At the resolution meeting, DCPS did not state or suggest that the evaluations were not necessary. R. at 26-27.

At the resolution meeting, Ms. Braxton refused to abandon her due process complaint, but stated her intent to cooperate with any DCPS effort to evaluate L.C.. R. at 26-27. Following the resolution meeting, DCPS did not complete any of the evaluations recommended in the September 26, 2006 SEP before December 22, 2006, the day of the administrative hearing.

At the hearing, the Plaintiff presented seven documents, most notably the September 26, 2006 SEP and the November 28, 2006 resolution meeting notes. R. at 17-32. DCPS presented no documents. R. at 33-34. Neither party called any witnesses. R. at 35-43.

In a very brief hearing, the Plaintiff, noting counsel's belief that there was no disagreement regarding the facts, stated that DCPS had committed to performing "cognitive [psychological], clinical and [] vocational" evaluations, and had not done so.

---

[2] The response(s) also contained virtually none of the information required by law in a response to a due process complaint notice. See 20 U.S.C. § 1415(c)(2)(B).
[3] The question of the admissibility of notes of a "resolution session" or "resolution meeting" held under the IDEA has been disputed since the IDEA was amended to require such meetings, effective July 2005. DCPS has consistently maintained that notes of these meetings are admissible. In a recent decision, this Court held that such notes are admissible, though a hearing officer may not rule on the basis of a parent's rejection of a settlement offer at such a meeting. See Davis v. District of Columbia, 2006 U.S. Dist. LEXIS 94650, 19-22 (2006), adopted and approved, D.D. v. District of Columbia, 470 F. Supp. 2d 1 (D.D.C. 2007). In the case at bar, the Plaintiff offered the notes into the record and DCPS counsel did not object.

R. at 38. The Plaintiff asked for relief in the form of independent evaluations at market rate, with a meeting to follow to complete certain objectives. Id.

In response, DCPS did not argue that DCPS had not been obliged to perform the evaluations, or allege that any of them had been done. Instead, DCPS argued that, because there had been "no showing of harm," the hearing officer could not find a denial of FAPE for what DCPS contended was a procedural violation. R. at 39-41.

The Plaintiff responded by arguing that: 1) the Hearing Officer was empowered to enforce the procedural rules; 2) the failure to perform evaluations was a denial of FAPE; and 3) DCPS' argument was circular because harm from the failure to perform evaluations could never be shown until the evaluations were performed. R. at 40-41.

The Hearing Officer issued an HOD on January 4, 2007. R. at 2-6. The hearing officer "agree[d] with counsel for DCPS' argument that counsel for the parent has not met his burden of proof that DCPS denied a FAPE to the student," and therefore dismissed the case.[4] R. at 4-5.

## STATUTORY FRAMEWORK

The IDEA, 20 U.S.C. § 1400, et seq., guarantees "that all children with disabilities have available to them free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.300.

"The primary vehicle for implementing these congressional goals is the "individualized educational program (IEP)…Prepared at meetings between a representative of the local school district, the child's teacher, the parents or guardians,

---

[4] As a technical matter, the Hearing Officer identified the decision as the granting of a motion for a directed verdict, though the meaning of that term in this context is unclear.

4

and, whenever appropriate, the disabled child, the IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig v. Doe, 484 U.S. 305, 311 (1988).

Students' abilities must be assessed and evaluated before they can be found eligible to receive specialized instruction. See 20 U.S.C. § 1414(b)(4). Therefore, each public agency must ensure that "[t]he child is assessed in all areas of suspected disability," "including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304(c)(4); see also 20 U.S.C. §§ 1414(c)(2), 1414(d)(3)(A)(iii), 1414(d)(4)(A)(ii)(II); 34 C.F.R. §§ 300.304(c)(4), 300.305(c).

Congress has also afforded parents several procedural safeguards. See 20 U.S.C. § 1415. Among them are the right to an administrative "due process hearing." Prior to a due process hearing, after the filing of a due process complaint notice, the local educational agency must file a response to the complaint and must convene a "resolution session," at which the parties discuss possible resolution of the complaint. 20 U.S.C. § 1415(c)(2)(B); 20 U.S.C § 1415(f)(1)(B).

"Any party aggrieved by the findings and decision" at a due process hearing has the right "to bring a civil action with respect to the complaint presented...in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). In such a proceeding, the focus of a reviewing court's inquiry is two-fold: (1) whether the state has complied with the procedural requirements of the Act; and (2) whether the IEP developed through these procedures is "reasonably calculated to enable

the child to receive educational benefits." <u>Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley</u>, 458 U.S. 176, 206-207 (1982).

## SUMMARY JUDGMENT STANDARD

In general, summary judgment is appropriate when the record as a whole shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

When considering a motion for summary judgment, a trial court must draw all justifiable inferences in the non-moving party's favor, but the non-moving party may not rely on mere conclusory allegations, and "must present significant probative evidence tending to support" its position. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In a summary judgment motion, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

Unlike typical judicial review of administrative action, in suits filed under the IDEA following an administrative hearing, the court bases its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B)(iii). "The district court's standard of review under the IDEA is less deferential than that applied under the traditional substantial evidence test used in ordinary administrative review cases." <u>Scorah v. District of Columbia</u>, 322 F. Supp. 12, 16 (D.D.C. 2004) (citing <u>Kerkam v. McKenzie</u>, 862 F.2d 884, 887 (D.C. Cir. 1988) and <u>Kroot v. D.C.</u>, 800 F. Supp. 976, 981 (D.C.C. 1992)). Still, the Plaintiff must persuade the court that the hearing officer was wrong, and

the court must explain its basis for ruling against the hearing officer. <u>See</u> <u>Kerkam v.</u>

<u>McKenzie</u>, 862 F.2d 884, 887 (D.C. Cir. 1988).

**ARGUMENT**

**I.    DCPS WAIVED ITS ARGUMENT THAT THE FAILURE TO EVALUATE
L.C. DID NOT RESULT IN A DENIAL OF FAPE**

DCPS served on Ms. Braxton a response to her due process complaint, and

participated in a resolution meeting. Exhibit 1; R. at 24-27. Because DCPS did not in

either context raise any question regarding the necessity of the evaluations or the denial

of FAPE in their absence, DCPS waived any defense on those grounds.

In response to the due process complaint, DCPS was required to serve on Ms.

Braxton, within ten days of the filing of the due process complaint, a response containing

all of the following information:

> (aa) an explanation of why the agency proposed or refused to take the action
> raised in the complaint;
> (bb) a description of other options that the IEP Team considered and the reasons
> why those options were rejected;
> (cc) a description of each evaluation procedure, assessment, record, or report the
> agency used as the basis for the proposed or refused action; and
> (dd) a description of the factors that are relevant to the agency's proposal or
> refusal.

20 U.S.C. § 1415(c)(2)(B)(i)(I). Additionally, DCPS was required to convene a resolution

session within fifteen days of the filing of the due process complaint. 20 U.S.C. §

1415(f)(1)(B).

DCPS served its Response on Ms. Braxton, but it contained none of the required

information. Exhibit 1.[5] While the Response does contain a statement identified as

"DCPS' rationale for proposing/refusing to take action identified in complaint," the

rationale consists only of the admissions that the September 26, 2006 meeting occurred

---

[5] <u>See</u> footnote 1, <u>supra</u>.

and that the evaluations had not been completed, and the statement that DCPS was "attempting" to have them completed. Exhibit 1.

The Response does not contain any claim that the evaluations were not necessary, or that L.C. would not be harmed by DCPS' failure to perform them. See Exhibit 1. To the contrary, the Response clearly indicates that the evaluations were necessary, as DCPS claimed to be "attempting" to perform them. See id.

Similarly, DCPS did not suggest at the resolution meeting that the evaluations were not necessary, or that L.C. had not or would not be harmed by a failure to perform them. Instead, DCPS offered to conduct them.

By declining to raise any issue regarding the necessity of the evaluations or the impact of their absence, in the legally mandated Response, in the legally mandated resolution meeting, or in any other context, DCPS waived its opportunity to do so months later at the hearing.

## II.    THE FAILURE TO PERFORM NECESSARY EVALUATIONS WAS A DENIAL OF FAPE EVEN IF IT WAS A PROCEDURAL VIOLATION

As argued infra, Argument III, the Plaintiff contends that the failure to perform necessary evaluations is a substantive violation of the law, not a procedural violation. However, even if it is a procedural violation, the violations in this case constituted a denial of FAPE.

Procedural violations constitute a denial of FAPE if they have "impeded the child's right to a [FAPE]...significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE]...or...caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). In this case, DCPS' failure to perform the evaluations has done all three.

The failure to evaluate L.C. has "impeded [his] right to a [FAPE]" and has "caused a deprivation of educational benefits," in that it delayed, and has continued to delay, his receipt of instruction and services in accordance with those evaluations. It is of course impossible to determine exactly what the IEP team would prescribe for L.C. based on the evaluations, but those evaluations that have now been performed recommend instruction and services beyond what his current IEP prescribes.

For example, the psychoeducational evaluation that Rock Creek Academy eventually performed prescribes, among other things, access to "the latest technology...[including] a computer, calculator, tape-recorder and books-on-tape," which are not identified in his current IEP's list of supplemental aids. See Exhibit 2 at 10; Exhibit 4 at 2.[6] It also recommends specific instructional approaches, such as "using a written assignment as a warm up for more difficult assignments such as math and reading" and "a curriculum rich with real world type math assignments, significant remedial skills training in reading, utilizing books on tape and other aides[.]" Exhibit 2 at 10.

The Career Assessment Report eventually completed[7] contains far too much information about L.C., and too many recommendations regarding his instruction, to recount in full here, but the summary pages are attached hereto as Exhibit 3.[8] The Report includes an analysis of L.C.'s learning and work styles and his vocational strengths, and specific recommendations regarding job placement, accommodations when volunteering,

---

[6] The Plaintiff has attached hereto only the relevant excerpts from L.C.'s current IEP, which is 28 pages long.

[7] The Report indicates that assessment work was performed on October 31, 2006 and November 1, 2006. Exhibit 3. There is no indication as to when the Report was completed. Id. DCPS did not provide the Report to the Plaintiff until March 20, 2007. Id.

[8] The Plaintiff has attached hereto only the first five pages of the report – the text summary – and not the 42 pages of testing results.

and, perhaps most relevant to his future IEP, "career skills [that] need to be incorporated into his class lesson plans." Exhibit 3 at 3-5. Almost none of that is present in the Transition Services Plan in L.C.'s current IEP. See Exhibit 4 at 3-4.

These direct denials aside, DCPS' failure to perform the evaluations plainly "impeded [Ms. Braxton's] opportunity to participate in the decisionmaking process regarding the provision of a [FAPE]" to L.C.. With the necessary evaluations undone, Ms. Braxton – along with L.C.'s teachers and counselor's, and the rest of his IEP team – has lacked the information necessary fully to participate in decisionmaking. Now that the psychoeducational and vocational evaluations have been completed and provided to Ms. Braxton, well after the hearing, she and the IEP team still lack the information to be gleaned from the required clinical psychological evaluation.

Because DCPS' failure to perform the necessary evaluations impeded L.C.'s access to, and deprived him of, instruction and services recommended in those evaluations, and because DCPS' failure to perform the evaluations deprived his mother of information necessary to the decisionmaking process, that failure has caused a denial of FAPE even if it is a procedural violation of the law.

## III.    IT WAS NOT NECESSARY TO SHOW HARM RESULTING FROM THE SUBSTANTIVE VIOLATIONS

The Hearing Officer erroneously assumed, without any analysis, that DCPS' complete failure to perform necessary evaluations was a procedural violation of the law, and that the Plaintiff was accordingly required to prove resulting harm at the hearing. Because the complete failure to perform necessary evaluations is a substantive violation of the law, the Hearing Officer erred in holding that the Plaintiff was required to show harm.

10

The Hearing Officer clearly based his determination on his belief that DCPS' failure to perform the evaluations was a procedural violation of the IDEA. The bulk of his discussion of law consists of two quotes: one from Kingsmore v. District of Columbia, 466 F. 3d 118 (D.C. Cir. 2006), a decision "reiterat[ing] that procedural violations of IDEA that are harmless do not deny a FAPE," and the other from 34 C.F.R. § 300.513, which addresses decisions "[i]n matters alleging a procedural violation." See R. at 4. Nowhere, however, does the Hearing Officer address the question of whether the total failure to perform necessary evaluations constitutes merely a procedural violation of the law, despite the fact that the Plaintiff argued to the contrary at the hearing. See R. at 40.

There is no argument that procedural violations of the IDEA do not necessarily rise to the level of the denial of FAPE; the IDEA makes that perfectly clear. See 20 U.S.C. § 1415(f)(3)(E)(ii). Unfortunately, neither the statute nor the regulations gives any indication as to which violations are procedural and which are substantive.

In Kingsmore, The case cited in the HOD, the violation in question was the failure to produce a complete transcript of the administrative proceedings, a completely different issue that the one in this case. See 466 F. 3d 118. In Lesesne v. District of Columbia, a case cited in Kingsmore, the procedural violation was the failure timely to evaluate, not the failure to evaluate at all, and regardless, the court ruled that there had been no violation regardless. See 447 F.3d 828, 834, footnote 2 (D.C. Cir. 2006) ("The record does not suggest that DCPS failed to complete B.F's 'evaluation' before the new deadline, February 27, 2004.").

Finally, in none of the cases cited in Lesesne had the school district entirely failed to perform evaluations. In most cases referring to "procedural violations," the violations

11

in question related to technicalities in IEP drafting. <u>See</u> <u>Lesesne</u>, 447 F.3d at 834 (citing several cases involving procedural violations, none of which involved the failure to perform necessary evaluations).

The basic structure of the IDEA indicates that the failure to perform necessary evaluations is a substantive violation. In the broad perspective, the IDEA requires only two things: evaluation, and IEP development. <u>See</u>, <u>e.g.</u>, 20 U.S.C. § 1414. While some of the detailed requirements regarding the accomplishment of those tasks constitute procedures, the outright failure to perform one of them must be considered a substantive violation of the law. The failure to perform necessary evaluations is no less substantive, within the structure of the IDEA, than the failure to develop an IEP.

Etymology aside, DCPS' argument, which the Hearing Officer accepted, that a parent must prove direct substantive harm resulting from the failure to perform necessary evaluations is hopelessly circular. It is of course impossible to prove what an evaluation will recommend, and therefore what necessary instruction and services the student is currently missing, before the evaluation is completed.[9]

By the reasoning of DCPS and the Hearing Officer, DCPS could admit that an evaluation was warranted, but forever refuse to perform that evaluation, and a parent could never obtain relief because she could not prove the resulting harm. Rather than trap Ms. Braxton in that tautology, the Hearing Officer should have ruled that the undisputed statement in L.C.'s student evaluation plan that the evaluations were necessary sufficed to establish that he would be harmed in their absence, and that DCPS must perform them.

---

[9] In fact, though the Plaintiff has presented an argument, above, regarding the harm resulting from DCPS' failure to perform the psychoeducational and vocational evaluations, it remains impossible to say exactly what harm L.C. is experiencing as a result of DCPS' ongoing failure to perform the clinical psychological evaluation.

**IV.     THE HEARING OFFICER SHOULD HAVE ORDERED EVALUATIONS
REGARDLESS OF ANY QUESTION OF HARM OR FAPE**

The IDEA specifically provides that, all questions of harm and FAPE aside, a

hearing officer may always order the LEA to comply with procedural requirements. <u>See</u>

20 U.S.C. § 1415(f)(3)(E)(iii). Because DCPS had failed to perform evaluations of L.C.

that all agreed were necessary, the Hearing Officer should have ordered DCPS to perform

those evaluations or to fund them independently.

The Hearing Officer's refusal to order anything at all left Ms. Braxton powerless

to ensure that her son is properly evaluated, and therefore provided an appropriate IEP.

Since the hearing, Rock Creek Academy has performed the psychoeducational evaluation

and DCPS has performed the vocational evaluation, but L.C. still has not received a

clinical psychological evaluation, despite the facts that his only disability classification is

behaviorally based and that a clinical evaluation is designed to gather information

regarding emotional and/or behavioral disabilities. Ms. Braxton's only recourse for

DCPS' failure to do so, over what is now just under one year since the evaluation was

prescribed, is this action.

<b>CONCLUSION</b>

For the reasons stated above, the court should grant the Plaintiff summary

judgment on all of her claims, and order the relief requested in her Motion.


Respectfully submitted,

/s/Douglas Tyrka
Douglas Tyrka, #467500
Tyrka & Associates, LLC
1726 Connecticut Ave. NW, Suite 400
Washington, DC  20009

13

(ph) (202) 265-4260
(f) (202) 265-4264

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **ANGELA BRAXTON,** ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 07-632** |
| **v.** ) | **CKK** |
| ) | |
| **DISTRICT OF COLUMBIA,** ) | |
| **Defendant.** ) | |

_____)

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.  Ms. Braxton's son L.C. is a 17-year-old boy whom DCPS has classified as other health impaired ("OHI") as a result of attention deficit hyperactivity disorder ("ADHD"). Exhibits 1, 2.

2.  DCPS has placed L.C. in Rock Creek Academy, a full-time special education school placement. R. at 2.

3.  At an IEP meeting held on September 26, 2006, the IEP team determined that L.C. was in need of "current academic and cognitive testing," specifically "a vocational, psycho-educational, and clinical evaluation to determine his current level of functioning academically and behaviorally," and developed a Student Evaluation Plan ("SEP") to that effect. R. at 29.

4.  Ms. Braxton consented to those evaluations. R. at 29.

5.  DCPS did not complete any of those evaluations before October 31, 2006. Exhibit 1.[1]

_____

[1] In a summary judgment motion, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). At the administrative level, DCPS presented no evidence of the completion of any of the evaluations.

1

6. On October 31, 2006, Ms. Braxton filed an administrative "due process complaint notice." R. at 7, 8.

7. On November 13, 2006, DCPS served its response to the due process complaint.[2] Exhibit 1.

8. A "resolution meeting" was convened on November 28, 2006. R. at 24-27.

9. Following the resolution meeting, DCPS did not complete any of the evaluations recommended in the September 26, 2006 SEP before December 22, 2006, the day of the administrative hearing.[3]

10. Rock Creek Academy completed a psychoeducational evaluation of L.C. on January 22, 2007. Exhibit 2.

11. DCPS has produced a Career Assessment Report regarding L.C., which it provided to the Plaintiff on March 20, 2007. Exhibit 3.[4]

---

[2] The response in the record filed by the Defendant is not the one in the Plaintiff's possession, which is attached hereto as Exhibit 1. The Plaintiff received DCPS' response on November 13, 2006, via facsimile from Armand Hill, a DCPS paralegal. See Exhibit 1. The response in the record filed by the Defendant appears to have been sent to the Student Hearing Office, as it appears to be date-stamped, and it includes a certificate of service to Plaintiff's counsel, but the Plaintiff does not have a copy in the file. See R. at 10-11.

The two responses differ in several ways. The response in the filed record is dated one day later than the one in the Plaintiff's possession. See Exhibit 1; R. at 10-11. Though each contains a signature line for Aaron E. Price, Sr., the signatures are very different. See id.

Finally, the substance of the November 14, 2006 response is completely different. See id. Unfortunately, it is also false. No evaluations were administered on October 30, 2006. Though there is some indication that the testing portion of a vocational evaluation was performed on October 31, 2006 and November 1, 2006, there is no indication that any evaluation – much less "several" – had been completed by the date of the response. The clinical evaluation has never been completed. DCPS made no representation at the hearing that any evaluations had been completed.

Neither response was discussed at the hearing, so it is unclear, as of the time of the hearing, which of the two contradictory responses DCPS considered to be its true response. The Plaintiff here treats the November 13, 2006 as the only response for two reasons: 1) until reviewing the administrative record as filed by the Defendant, the Plaintiff was only aware of the November 13, 2006 response; 2) as most if not all of the statements of fact in the November 14, 2006 response are false, the Defendant would presumably prefer to treat the November 13, 2006 response as the response.

[3] See footnote 1, supra.

12. DCPS has not completed a clinical psychological evaluation of L.C. since September 26, 2006. [5]

13. L.C.'s most recent IEP was developed on September 26, 2006. Exhibit 4. [6]

Respectfully submitted,

/s/Douglas Tyrka
Douglas Tyrka, #467500
Tyrka & Associates, LLC
1726 Connecticut Ave. NW, Suite 400
Washington, DC  20009
(ph) (202) 265-4260
(f) (202) 265-4264

---

[4] The Plaintiff has attached hereto only the first five pages of the report – the text summary – and not the 42 pages of testing results.
[5] See footnote 1, supra.
[6] The Plaintiff has attached hereto only the relevant excerpts from L.C.'s current IEP, which is 28 pages long.



Office of the General Counsel
9th Floor
825 North Capitol Street, NE
Washington, DC 20002
(202) 442-5000
fax (202) 442-5098

## FACSIMILE

To: Douglas Tyrka

Co: ▓▓▓▓▓ C▓▓▓▓▓

Date: 11/13/06

Fax No.: (202) - 265 - 4264

Tele. No.: _____

From: Armand Hill

Tele. No.: (202) 442-5000

No. Pages Including Cover Sheet ___3___

Comments: _____

_____

_____

_____

_____

Confidentiality Notice
The information contained in this facsimile is transmitted by an attorney. It is privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, and return the original message to us at the above address via first class prepaid US postage. Thank you.

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**


  Petitioner

v.

District of Columbia Public Schools,
  Respondent

### District of Columbia Public School's
### Response to Due Process Complaint Notice[1]

The District of Columbia Public School (hereinafter "DCPS"), by and through the undersigned Attorney-Advisor, hereby provides its RESPONSE to the Administrative Due Process Complaint Notice (hereinafter "Complaint") filed on behalf of the above captioned student, pursuant to the Individuals with Disabilities Education Improvement Act (hereinafter "IDEIA"), 20 U.S.C. § 1415(c)(2)(B)(i)(I). DCPS responds as follows:

### a. DCPS' rationale for proposing/refusing to take action identified in complaint:

DCPS is attempting to have the psychological, clinical, and vocational evaluations completed. DCPS acknowledges that the evaluations have yet to completed however, the MDT team meeting was on September 26, 2006.

Respectfully submitted,

Aaron E. Price, Sr., Esq.
Attorney-Advisor, DCPS

---

[1] This response is submitted pursuant to 20 U.S.C. § 1415(c)(2)(B)(i)(I) and it is not intended to be an answer, or substitute, as contemplated by the Federal or District of Columbia Rules of Civil Procedure. Moreover, the agency response contained herein does not bind it to or preclude it from asserting defenses now known or may become available during the course of the due process proceedings.

-26-2007 16:33 From:



Challenging Minds. Building Character.

Rock Creek Academy, Inc.
4401 Connecticut Ave., NW
Washington, DC 20008
202.378.1400

## PSYCHO-EDUCATIONAL EVALUATION

Name: I████ C███      School:   Rock Creek Academy
DOB:                  Grade:    11th
Age:  17 years, 0 month   Examiner: Nadjai S. Plowden, MS
DOE: 1/16 & 1/17/2007    DOR:      1/22/2007

### REASON FOR REFERRAL:

L███ C████ is a 17-year-0-month-old, African American adolescent who was referred by his educational site for a psycho-educational evaluation. This psycho-educational evaluation will assess both his level of intellectual functioning and information processing abilities; while also measuring I███y's present level of academic functioning in reading, mathematics, written language, and oral language.

### EVALUATION METHODS:

Records Review
Wechsler Adult Intelligence Scale, Third Edition (WAIS-III)
Woodcock-Johnson III, Tests of Achievement (W-J III), Standard Battery

### RELEVANT BACKGROUND INFORMATION:

L███y C█████ is a 17-year-old African American adolescent who is a student at Rock Creek Academy. He is receiving services at that location with the primary disability classification of Other Health Impaired. His most recent IEP (9/06) stipulated that I███ was to receive the following services each week, with times in parentheses: Specialized Instruction (25 hours), Psychological Counseling (1.5 hours), and Substance Abuse Counseling (1 hour).

### BEHAVIORAL OBSERVATIONS:

L███ was evaluated in a relatively quiet room with few distractions Rock Creek Academy. He entered the evaluation session with remarkable reservation going so far as to say that his mother had to speak to him in order to coerce him to participate. However, it should be noted that he required few to no prompts during the session. I███ appeared relaxed and calm during the session. During several subtests such as Vocabulary, Comprehension, and Similarities I███, when queried, would supply brief one to two word responses or state, "I don't know that." This pattern was evident throughout the session. However, I███ showed enhanced effort when he knew he was under a time limit.

Throughout the evaluation session Larry's voice quality and level were consistent and was easy to comprehend. Larry spontaneously kept eye contact when his name was called or the evaluator paused. He is right handed, uses an adapted pencil grip, and uses his left hand well in coordination with his right. The present evaluation data should be considered a valid and reliable measure of his true abilities.

## TEST RESULTS AND INTERPRETATION:

### Cognitive Abilities:

### WAIS General Intellectual Ability

Larry was administered 11 subtests of the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) from which his IQ and Index scores were derived. The Full Scale IQ is the aggregate of the Verbal and Performance scores and is usually considered to be the most representative measure of g, or global intellectual functioning. Larry's general cognitive ability is in the Low Average range of intellectual functioning, as measured by the Wechsler Adult Intelligence Scale -Third Edition (WAIS-III). His overall thinking and reasoning abilities exceed those of approximately 10% of adults his age (FSIQ = 81; 95% Confidence Interval = 77-85).

### Verbal and Performance Abilities:

The Verbal score is a measure of acquired knowledge, verbal reasoning, and comprehension of verbal information. His verbal reasoning abilities, as measured by the Verbal IQ, are in the Low Average range and above those of approximately 13.0% of his peers (VIQ = 83, 95% Confidence Interval = 79-88). On the verbal reasoning subtests, Larry obtained his highest score(s) on the Comprehension subtest(s) and his lowest score(s) on the Similarities and Information subtest(s). His performance on these subtests differs significantly relative to each other and suggests that these are the areas of most pronounced strength and weakness, respectively, in Larry's profile of verbal reasoning abilities. His weak performance on the Similarities and Information subtest(s) is below that of most of his peers. The Verbal Comprehension Index (VCI) is similar to the Verbal IQ in that it provides a measure of verbal acquired knowledge and verbal reasoning. However, it does not include the measures of abilities related to working memory, such as holding information to perform a specific task. Therefore, the Verbal Comprehension Index may be considered a purer measure of verbal comprehension than is the Verbal IQ. In Larry's case, his Verbal Comprehension Index score are generally comparable to his Verbal IQ score. On the Verbal Comprehension Index, Larry's performance is somewhat less well developed than that of his peers. His ability to understand and respond to verbally presented material is better than that of only 9.0% of others his age (VCI = 80, 95% Confidence Interval = 75-86).

The Performance score provides an indication of an individual's nonverbal reasoning, spatial processing skills, attentiveness to detail and visual-motor integration. His nonverbal reasoning abilities, as measured by the Performance IQ, are in the Low Average range and better than those of approximately 13.0% of his peers (PIQ = 83, 95% Confidence Interval = 77-91). On the nonverbal reasoning subtests, Larry obtained his lowest score(s) on the Matrix Reasoning subtest(s). His performance differs significantly from his Nonverbal subtest mean score and suggests that this is the area of most pronounced weakness in Larry's profile of nonverbal reasoning abilities.The Perceptual Organization Index (POI) is actually a purer measure of nonverbal reasoning than is the Performance IQ. The POI measures fluid reasoning, spatial processing, attentiveness to detail, and visual motor integration. However, it does not measure the individual's speed in processing information or

performing simple tasks related to that information. In Larry's case, his Perceptual Organization Index score is comparable to his Performance IQ score. Larry's nonverbal reasoning abilities are less developed than those of his peers. His performance on the Perceptual Organization Index exceeds that of only 7.0% of his age-mates (POI = 78, 95% Confidence Interval = 72-87).

His ability to think with words is comparable to his ability to reason without the use of words. Both Larry's verbal reasoning and nonverbal reasoning abilities are also in the Low Average range.

## IQ Scores Summary

| Scale | Sum of SS | IQ Score | 95% Conf. Interval | PR | Qualitative Description |
|---|---|---|---|---|---|
| Verbal | 43 | 83 | 79-88 | 13.0 | Low Average |
| Performance | 38 | 83 | 77-91 | 13.0 | Low Average |
| Full Scale | 80 | 81 | 77-85 | 10.0 | Low Average |

Difference between VIQ and PIQ = 0(ns, Freq= 100%).

## Subtest Scores Summary

| Verbal Subtests | Raw Score | Age SS | PR | Reference SS* |
|---|---|---|---|---|
| Vocabulary | 23 | 7 | 16 | 6 |
| Similarities | 13 | 6 | 9 | 5 |
| Arithmetic | 10 | 8 | 25 | 8 |
| Digit Span | 13 | 7 | 16 | 7 |
| Information | 7 | 6 | 9 | 6 |
| Comprehension | 16 | 9 | 37 | 8 |
| Letter-Number Sequencing | | | | |

## Subtest Scores Summary

| Performance Subtests | Raw Score | Age SS | PR | Reference SS* |
|---|---|---|---|---|
| Picture Completion | 20 | 9 | 37 | 9 |
| Digit Symbol-Coding | 69 | 8 | 25 | 8 |
| Block Design | 24 | 6 | 9 | 6 |
| Matrix Reasoning | 6 | 4 | 2 | 5 |
| Picture Arrangement | 16 | 10 | 50 | 10 |
| Symbol Search | | | | |
| Object Assembly | | | | |

*Reference Group for ages 20-34

## Summary of WAIS-III Intellectual Abilities

On the basis of his WAIS-III performance, Larry's verbal comprehension skills and his nonverbal reasoning abilities are comparable. Larry is a 17 year old male who completed the WAIS-III. His overall cognitive ability, as estimated by the Full Scale IQ, is in the Low Average range (FSIQ=81). On the Verbal scale, his score is in the Low Average range (VIQ = 83). Larry's Performance score is in the Low Average range (PIQ = 83). On the Perceptual Organization Index, he performed in the Borderline range (POI = 78). Larry performed in the Low Average range on the Verbal Comprehension Index (VCI = 80).

## Academic Achievement:

Larry was also administered the **Woodcock-Johnson Tests of Achievement, Third Edition, Form A (W-J III)** measuring four academic areas: Reading, Oral Language, Math, and Written Language. Performances on the 13 individual tests within this battery combine to produce 10 cluster scores that indicate Larry's achievement in certain academic areas. A handwriting test gives an independent handwriting assessment, which is not considered in any of the cluster scores. The mean score for this battery is 100, with a standard deviation of +/- 15. The scores can be interpreted using the following categories:

| | |
|---|---|
| 131 and above | Very Superior Range |
| 121-130 | Superior Range |
| 111-120 | High Average Range |
| 90-110 | Average Range |
| 80-89 | Low Average Range |
| 70-79 | Low Range |
| 69 and Below | Very Low Range |

The W-J III battery covers a wide range of academic skills and can be useful in academic planning. Scores, however, should be interpreted with caution since the norm sample used was weighted to match the US census, which does not match the demographic population of Washington, D. C.

Summaries of all scores and graphs to assist in interpreting the scores are attached to this report. Larry's performance on the W-J III is discussed below.

## READING

To assess his current level of functioning in the area of reading, Larry was administered the **Letter-Word Identification, Reading Fluency, and Passage Comprehension** tests of the W-J III. Performance on these tests yields one cluster score, **Broad Reading**, which is described below.

The **Broad Reading** cluster provides a comprehensive measure of reading achievement including reading decoding, reading speed, and ability to comprehend connected discourse while reading. This cluster is a combination of the **Letter-Word Identification, Reading Fluency, and Passage Comprehension** tests. Larry earned a **Broad Reading** cluster Standard Score of 86 (18th %ile, AE 12-6), which was in the Low Average range and ranked at the 7.1 grade level. The various tests that made up this cluster are described below.

The **Letter-Word Identification** test measures the subject's word identification skills. The initial items require the individual to decode words correctly. The individual is not required to know the meaning of any word. The items become increasingly difficult as the selected words appear less and less frequently in written English. L___ has developed average skills with decoding using phonics. In addition, he seems to have a close approximation to the expected sight vocabulary for a student his age. On this test L___ received a Standard Score of 91 (27th %ile, AE 13-6), which was in the Average range and ranked at the 8.0 grade level.

The **Reading Fluency** test measures the person's ability to quickly read simple sentences in the Subject Response Booklet, decide if the statement is true, and circle "yes" or "no". The difficulty range of these sentences gradually increases to a moderate level. The individual tried to complete as many items as possible in a three-minute time limit. L___ was able to complete 63 items with 9 errors. L___ received a Standard Score of 88 (21st %ile, AE 13-2), which was in the Low Average range and ranked at the 7.9 grade level.

The items presented to L___ on the **Passage Comprehension** test required him to read a short passage and identify a missing key word that made sense in the context of that passage. The items became increasingly difficult by removing pictorial stimuli and by increasing passage length, level of vocabulary, and complexity of syntactic and semantic cues. L___ had remarkable difficulty with the **Passage Comprehension** items. Interestingly, while he again showed average use of the phonics skills that were evident in the **Letter-Word Identification** test responses; his comprehension skills were poorly developed and he was consistently unable to use context cues and seemed to have little to no practice completing similar types of reading tasks. L___ received a Standard Score of 76 (5th %ile, AE 9-4), which was in the low range and ranked at the 4.0 grade level.

## ORAL LANGUAGE

To assess his abilities to understand and use information presented orally, L___ was administered the **Story Recall**, **Story Recall-Delayed**, and **Understanding Directions** tests of the W-J III. Performance on these tests is described below. Analysis of these three tests yields one cluster score, **Oral Language**.

The **Oral Language** Cluster score is an aggregate measure of linguistic competency, listening ability, and comprehension. L___ earned an **Oral Language** Cluster Standard Score of 90 (26th %ile, AE 12-7), which was in the Average range and ranked at the 7.6 grade level.

The **Story Recall** and **Story Recall-Delayed** tests measure aspects of oral language including language development and meaningful memory. The task requires the student to recall increasingly complex stories that are presented orally. After listening to a passage, the individual is asked to recall as many details of the story as can be remembered. The delay task is similar, but given at least one hour later. L___ performed below average on the **Story Recall** tasks. He remembered the beginnings equally well as the middle and end parts and inconsistently remembered the most salient or bold-faced words repeatedly. He performed in a similar manner on the **Story Recall-Delayed** as he had on the immediate recall tasks. He received a **Story Recall** Standard Score of 88 (22nd %ile, AE 10-5), which was in the Low Average range and ranked at the 5.0 grade level.

The **Understanding Directions** test is an oral language measure. The task requires the student to listen to audio-recorded instructions and then follow directions by pointing to various objects in a colored picture. The items gradually increase in linguistic complexity as the number of task to perform increases. L___'s responses to the **Understanding Directions** test were relatively consistent in that he answered the easier ones correctly as

well as the more difficult ones. As the tasks became more difficult he exhibited strengths by accurately identifying the items asked to be pointed out. He showed inconsistent comprehension of directions which included cues such as, "If...then..." as well as "Either choose...or..." His test Standard Score was 92 (30th %ile, AE 13-8), which was in the Average range and ranked at the 8.0 grade level.

## MATHEMATICS

To assess his current level of functioning in the area of mathematics, L____ was administered the **Calculation, Applied Problems**, and **Math Fluency** tests of the W-J III. Performance on these tests yields two cluster scores, **Broad Math** and **Math Calculation Skills**, which are described below.

The **Broad Math** cluster provides a comprehensive measure of math achievement including the ability to perform mathematical computations, the ability to solve simple addition, subtraction, and multiplication facts quickly, and the ability to analyze and solve math problems. L____ earned a **Broad Math** cluster Standard Score of 81 (11th %ile, AE 12-0), which was within the Low Average range and ranked at the 6.5 grade level. The various tests that make up this cluster are discussed below.

The **Calculation** test measures the subject's ability to perform mathematical computations. The initial items in the Calculation test require the subject to perform addition, subtraction, multiplication, and division with whole numbers, fractions, percents, and negative numbers. L____ has below average skills in basic math operations. He has evidently memorized several of the addition, subtraction, division, and multiplication basic math facts. On several of the problems he was able to perform the processes such as borrowing, carrying, and simple addition for more than two numbers. He was not able to complete any long division problems or problems involving fractions when least common denominator or reduction of fractions was involved, percents, negative numbers, or any algebraic solutions. His **Calculation** test Standard Score was 80 (9th %ile, AE 11-9), which was in the Low Average range and ranked at the 6.2 grade level.

The **Math Fluency** test presents a number of one-digit addition, subtraction, and multiplication problems. The student is to solve as many as possible in three minutes. On the math fluency tasks L____ showed below average ability with completing his basic math facts quickly. He completed 89 problems with four errors, L____'s **Math Fluency** test Standard Score was 83 (14th %ile, AE 12-6), which was in the Low Average range and ranked at the 7.1 grade level.

The **Applied Problems** test requires the student to analyze and solve math problems. To solve the problems the person must listen to the problem, recognize the procedure to be followed, and then perform relatively simple calculations. Because many of the problems contain extraneous information, the individual must decide not only the appropriate mathematical operation to use, but also which numbers to include in the calculation. Item difficulty increases with complex calculations. L____'s performance on the **Applied Problems** tasks indicated that he has had *some* of the basic life experiences that would be expected of a boy his age. He was able to solve some problems involving money and telling time. His **Applied Problems** test Standard Score was 86 (18th %ile, AE 11-11), which was in the Low Average range and ranked at the 6.4 grade level.

The **Math Calculation Skills Cluster** is an aggregate measure of computational skills and automaticity with basic math facts and provides a measure of basic math skills. Calculation and **Math Fluency** tests comprise this cluster, L____ received a cluster Standard Score of 80 (10th %ile, AE 12-1), which was in the Low Average range and ranked at the 6.5 grade level.

## WRITTEN LANGUAGE

To measure L███'s achievement in written language, he was administered the **Spelling, Writing Fluency,** and Writing Samples tests of the W-J III, which produce two language cluster scores, **Broad Written Language** and Written Expression. These tests and cluster scores are discussed below.

The **Broad Written Language** cluster provides a comprehensive measure of written language achievement including spelling of single word responses, fluency of production, and quality of expression. **Spelling, Writing Fluency,** and Writing Samples tests comprise this cluster. L███ received a **Broad Written Language** cluster Standard Score of 94 (36ᵗʰ %ile, AE 14-10), which was in the Average range and ranked at the 9.1 grade level.

The **Spelling** test measures the ability to write orally presented words correctly. The items become increasingly difficult as the words contain more syllables and spelling irregularities. L███ seems to rely on memory and an average grasp of phonetics to spell the words that he was able to answer correctly. He received a **Spelling** test Standard Score of 93 (31ˢᵗ %ile, AE 14-7), which was in the Average range and ranked at the 8.3 grade level.

The **Writing Fluency** test measures skills in formulating and writing simple sentences quickly. Each sentence must relate to a given stimulus picture in the Subject Response Booklet and includes a given set of three words. This test has a seven-minute time limit. L███ received a Standard Score of 103 (59ᵗʰ %ile, AE >20), which was in the Average range and ranked at the 12.9 grade level.

The **Writing Samples** test measures skill in writing responses to a variety of demands. The person must produce written sentences that are evaluated with respect to the quality of expression. Item difficulty increases by increasing the passage length, level of vocabulary, grammatical complexities, and level of concept abstraction. The individual is not penalized for errors in basic writing skills such as spelling, capitalization, or punctuation. L███ performed below average on the **Writing Samples** tasks. On the **Writing Samples** test he received a Standard Score of 78 (7ᵗʰ %ile, AE 10-3), which was in the Low range and ranked at the 4.8 grade level.

The **Written Expression** cluster is an aggregate measure of meaningful written expression and fluency providing a measure of written expression skills. This cluster is a combination of the **Writing Fluency** and Writing Samples tests. His **Written Expression** cluster Standard Score was 96 (40ᵗʰ %ile, AE 15-1), which was in the Average range and ranked at the 9.7 grade level.

## SPECIAL PURPOSE CLUSTERS

Various combinations of tests in the W-J III Standard Battery are used together to form four additional cluster scores: Academic Skills, Academic Fluency, Academic Applications, and Total Achievement. The skills and applications clusters test reading, math, and written language, and can be used to determine whether the person exhibits significant strengths, weaknesses, or both among these types of tasks and across academic areas.

The Academic Skills Cluster is an aggregate measure of reading decoding, math calculation, and spelling of single-word responses, providing an overall score of basic achievement skills. It is a combination of the Letter-Word Identification, Calculation, and Spelling tests. Each of these tests was discussed previously. █████'s Academic Skills cluster Standard Score was 87 (19th %ile, AE 13-2), which was in the Low Average range and ranked at the 7.4 grade level.

The Academic Fluency Cluster is a combination of Reading Fluency, Math Fluency, and Writing Fluency that provides an overall index of academic fluency or speed with which the student can read, perform simple math problems, and perform simple writing tasks. █████'s Academic Fluency cluster Standard Score was 90 (24th %ile, AE 13-1), which was in the Average range and ranked at the 8.6 grade level.

The Academic Applications cluster is composed of the Passage Comprehension, Applied Problems, and Writing Samples test. These three tests require the application of academic skills to academic problems and are discussed above. Tasks for this cluster score were completed with out time limits. █████'s Academic Applications Score was 78 (7th %ile, AE 10-10), which was in the Low range and ranked at the 5.3 grade level.

The Total Achievement Cluster is a combination of the nine tests included in the Broad Reading, Broad Math, and Broad Written Language cluster scores and can be viewed as representing a person's overall performance across the various achievement domains. The major reason for the Low Average achievement score attained by █████ is his cumulative low average abilities with mathematics, written language, and reading. █████'s Total Academic Achievement Standard Cluster score was 84 (14th %ile, AE 12-10), which was in the Low Average range and at the 7.3 grade level.

| Cluster | Raw | AE | Easy to Diff | | RPI | PR | SS(68% Band) | GE |
|---|---|---|---|---|---|---|---|---|
| ORAL LANGUAGE | -- | 12-7 | 8-6 | >21 | 83/90 | 26 | 90 (85-95) | 7.6 |
| TOTAL ACHIEVEMENT | -- | 12-10 | 11-1 | 14-11 | 51/90 | 14 | 84 (82-85) | 7.3 |
| BROAD READING | -- | 12-6 | 11-2 | 14-0 | 32/90 | 18 | 86 (85-80) | 7.1 |
| BROAD MATH | -- | 12-0 | 10-6 | 14-0 | 56/90 | 11 | 81 (79-84) | 6.5 |
| BROAD WRITTEN LANG | -- | 14-10 | 11-11 | 18 | 81/90 | 36 | 94 (92-97) | 9.1 |
| MATH CALC SKILLS | -- | 12-1 | 10-3 | 14-6 | 51/90 | 10 | 80 (77-84) | 6.5 |
| WRITTEN EXPRESSION | -- | 15-1 | 11-11 | >21 | 86/90 | 40 | 96 (93-100) | 9.7 |
| ACADEMIC SKILLS | -- | 13-2 | 11-5 | 15-4 | 61/90 | 19 | 87 (84-89) | 7.4 |
| ACADEMIC FLUENCY | -- | 13-11 | 15-8 | 15-8 | 61/90 | 24 | 90 (88-91) | 8.6 |
| ACADEMIC APPS | -- | 10-10 | 9-3 | 13-1 | 50/90 | 7 | 78 (75-81) | 5.3 |

Form A of the following achievement tests was administered:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Letter-Word Identification | 62 | 13-6 | 12-2 | 15-4 | 55/90 | 27 | 91 (88-94) | 8.0 |
| Reading Fluency | 57 | 13-2 | 12-3 | 14-1 | 16/90 | 21 | 88 (86-89) | 7.9 |
| Story Recall | -- | 10-5 | 6-1 | >21 | 22/90 | 22 | 88 (80-97) | 5.0 |
| Understanding Directions | -- | 13-0 | 9-10 | 18-11 | 81/90 | 30 | 92 (87-97) | 9.0 |
| Calculation | 21 | 11-9 | 10-5 | 13-9 | 44/90 | 9 | 80 (75-85) | 6.2 |

| Math Fluency | 85 | 12-6 | 10-0 | 16-2 | 72 | /90 | 14 | 83 | (81-86) | 7.1 |
| Spelling | 41 | 14-7 | 11-11 | 17-0 | 70 | /90 | 31 | 93 | (89-96) | 8.3 |
| Writing Fluency | 27 | >20 | 14-6 | >20 | 95 | /90 | 59 | 103 | (98-108) | >12.9 |
| Passage Comprehension | 29 | 9-4 | 8-4 | 11-2 | 36 | /90 | 5 | 76 | (71-81) | 4.0 |
| Applied Problems | 39 | 11-11 | 10-10 | 13-4 | 34 | /90 | 18 | 86 | (84-89) | 6.4 |
| Writing Samples | 10-D | 10-3 | 8-0 | 17-2 | 75 | /90 | 7 | 78 | (69-87) | 4.8 |
| Story Recall--Delayed | – | – | – | – | | | – | | – | – |

## SUMMARY:

Larry C_____ is a 17-year-old African American adolescent who is a student at Rock Creek Academy. He is receiving services at that location with the primary disability classification of Other Health Impaired. His most recent IEP (9/06) stipulated that Larry was to receive the following services each week, with times in parentheses: Specialized Instruction (25 hours), Psychological Counseling (1.5 hours), and Substance Abuse Counseling (1 hour).

On the basis of his WAIS-III performance, Larry's verbal comprehension skills and his nonverbal reasoning abilities are comparable. Larry is a 17 year old male who completed the WAIS-III. His overall cognitive ability, as estimated by the Full Scale IQ, is in the Low Average range (FSIQ=81).On the Verbal scale, his score is in the Low Average range (VIQ = 83). Larry's Performance Score is in the Low Average range (PIQ = 83).On the Perceptual Organization Index, he performed in the Borderline range (POI = 78). Larry performed in the Low Average range on the Verbal Comprehension Index (VCI = 80). His verbal reasoning abilities, as measured by the Verbal IQ, are in the Low Average range and above those of approximately 13.0% of his peers (VIQ = 83, 95% Confidence Interval = 79-88). On the verbal reasoning subtests, Larry obtained his highest score(s) on the Comprehension subtest(s) and his lowest score(s) on the Similarities and Information subtest(s). His performance on these subtests differs significantly relative to each other and suggests that these are the areas of most pronounced strength and weakness, respectively, in Larry's profile of verbal reasoning abilities.His weak performance on the Similarities and Information subtest(s) is below that of most of his peers. The Verbal Comprehension Index (VCI) is similar to the Verbal IQ in that it provides a measure of verbal acquired knowledge and verbal reasoning. However, it does not include the measures of abilities related to working memory, such as holding information to perform a specific task. Therefore, the Verbal Comprehension Index may be considered a purer measure of verbal comprehension than is the Verbal IQ. In Larry's case, his Verbal Comprehension Index score is generally comparable to his Verbal IQ score. On the Verbal Comprehension Index, Larry's performance is somewhat less well developed than that of his peers. His ability to understand and respond to verbally presented material is better than that of only 9.0% of others his age (VCI = 80, 95% Confidence Interval = 75-86). The Performance score provides an indication of an individual's nonverbal reasoning, spatial processing skills, attentiveness to detail and visual-motor integration. His nonverbal reasoning abilities, as measured by the Performance IQ, are in the Low Average range and better than those of approximately 13.0% of his peers (PIQ = 83, 95% Confidence Interval = 77-91). On the nonverbal reasoning subtests, Larry obtained his lowest score(s) on the Matrix Reasoning subtest(s). His performance differs significantly from his Nonverbal subtest mean score and suggests that this is the area of most pronounced weakness in Larry's profile of nonverbal reasoning abilities.The Perceptual Organization Index (POI) is actually a purer measure of nonverbal reasoning than is the Performance IQ. The POI measures fluid reasoning, spatial processing, attentiveness to detail, and visual motor integration. However, it does not measure the individual's speed in processing information or performing simple tasks related to that information.

In L___'s case, his Perceptual Organization Index score is comparable to his Performance IQ score. L___'s nonverbal reasoning abilities are less developed than those of his peers. His performance on the Perceptual Organization Index exceeds that of only 7.0% of his age-mates (POI = 78, 95% Confidence Interval = 72-87).

L___ was administered a set of tests from the W-J III Tests of Achievement. Direct comparisons can be made among L___'s achievement scores. These comparisons help determine the presence and significance of any strengths and weaknesses among his abilities. L___'s oral language skills are average when compared to the range of scores obtained by others at his age level. When compared to others at his age level, L___'s academic skills and his fluency with academic tasks are both within the low average range. His ability to apply those skills falls within the low range. L___'s performance is average in written language and written expression; and low average in reading, mathematics, and math calculation skills. No discrepancies were found among L___'s achievement areas.

All of this information about his academic, cognitive, and processing strengths and weaknesses has significant implications for his subsequent academic and pre-vocational planning.

## RECOMMENDATIONS:

Based on these findings the following recommendations are made:

1. L___'s school should convene a Multi-Disciplinary Team to consider the test results and other current evaluations and recommend a special education program that is appropriate to meet his emotional, academic, and information processing needs.

2. Due to commensurate achievement and ability levels L___ will not qualify as a student with a specific learning disability. However, due to his classification as Other Health Impaired he still qualifies as a student in need of special education services. He will require a highly individualized program in a special school for adolescents with special needs. This program must be provided in a school placement that has on-site services for therapeutic intervention on an individual and group basis, which can be provided regularly in coordination with the academic program.

3. L___ should have available to him the latest technology in order to support him in his special education program. He should have available to him a computer, calculator, tape-recorder and books-on-tape.

4. L___'s teachers should seek to expand on his remarkable writing skills as means through which to facilitate overall growth, i.e. using a written assignment as a warm up for more difficult assignments such as math and/or reading.

5. L___ will require a curriculum rich with real world type math assignments, significant remedial skills training in reading, utilizing books on tape and other aides to assist his significant weaknesses in written language and reading.

6. L___ must be enrolled in an academic setting wherein he may have a low pupil to teacher ratio in order to find further academic success.

Formal or informal reevaluation should be conducted within one year to assess [████]'s progress on the goals and objectives set to better address his educational needs.

Evaluator: Nadjai S. Plowden, MS, GWU Doctoral Psychology Intern

Supervisor: Martha Ross Ozer, Ed.D, Psychologist
DC Psychology License # PSY 1000168

**Career Assessment Center**
MM Washington Career High School
Room 155
27 O Street, NW
Washington, DC 20001
Telephone #: 202.671.2875 Fax #: 202.673.7229

### Career Assessment Report

#### Student Information

| | | | |
|---|---|---|---|
| **Name:** | ▓▓▓▓ | **School:** | Rock Creek Academy |
| **Address:** | ▓▓▓▓ | **Address:** | ▓▓▓▓ |
| **Phone #:** | ▓▓▓▓ | **Phone #:** | ▓▓▓▓ |
| **Date of Birth:** | ▓▓▓▓ | **Referral Person:** | Sherrie Waul |
| **SS #:** | 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 | **Assessment Date:** 10/31-11/1/06 | |
| **Grade:** | 12th | **Evaluator:** | Mary V. Platt, CVE |

**Tests Given:** Self-assessment Survey, Cooking Work Sample, Air Conditioning and Refrigeration Work Sample, Simulated Assembly, (quit), Cosmetology Work Sample (quit), and SKILTRAN.

#### Reason for Referral

▓▓▓ participated in a 5-hour, level 3 career assessment to assist in identifying appropriate career interests, skills, and aptitudes and the level of support and/or training that will be necessary for successful school programming and future employment.

▓▓▓ missed about three hours of assessment and should consider returning one day to complete a thorough computer search of his top career choices. For his convenience, the Appendix portion of this report provides a custom report of his four interest areas. (athlete, chef, lawyer and business owner.)

#### Student Vocational Strengths

* Likes tasks that are competitive and demonstrates his dexterity abilities and physical stamina.
* Quiet, good communication skills when asked a series of questions
* Has excellent ability to work with his hands, separately and bi-manually, with and without tools
* Larry prefers tasks of high interest.

#### Student Vocational Needs

* ▓▓▓ does not always "hear" or attend to the full instructions. Appears to listen to get an indication of what the task is about then goes ahead with the task. When he runs into difficulty will call out for assistance. Not attentive to the fine details.
* ▓▓▓ prefers physical movement rather than sitting or standing for long periods of time. Consequently, ▓▓▓ will need breaks or a period of time to move around.
* ▓▓▓ quit several work samples, preferring to go on to another task as he appeared to lose interest. ▓▓▓ will need to continue with guidance counseling to assist him in understanding who he is and what are his interests, goals and potential achievements. Without self-awareness he will have difficulty developing the confidence to try new possibilities.
* Appears to be somewhat anxious in a new learning situation, will need supervision until task is learned.

1

- L█████ will need multi-sensory instructions and supports when he enrolls in a job-training program or a college program that relates to his career interests.
- Will need to continue to explore career interests and opportunities through hands-on experiences.
- In addition to exploring career opportunities and acquiring the basic skills and knowledge of a given occupation, L█████ will need to learn how to communicate his ideas, listen to others, organize his life so that he is where he needs to be on any given day; and take responsibility for his performance.

## Work History

L█████ was a recreational aide at the Beacon House during the summer of 2005. He got the job through the Summer Youth Program. His duties included childcare services where his major responsibilities were to watch the children, feed them meals, and play games. He especially liked the job as it was at the neighborhood rec center where most of his co-workers were his friends and he got paid. L█████ also liked his boss as he was the football coach.

## Vocational Interests

**Expressed:** L█████ was asked to describe his dream job(s). He stated that he would like to be a professional basketball player with the NBA, own a club in DC, and become a lawyer. After a brief discussion L█████ also added his interests in culinary arts.

L█████ did identify three cluster areas with four specific occupations:
- Sales and Distribution -- Entrepreneur, business manager, warehouse supervisor, stock clerk
- Sports and Entertainment -- Basketball player, athletic coach
- Crafts -- Culinary arts, chef, prep cook
- Lawyer

(Appendix A., located at the back of this report, describes each of these careers in detail.)

**Family Goals:** L█████ was asked to describe his parents' goals for him. He emphasized that his mother has the most influence on him and she would like him to graduate from high school and go to college. L█████ concurred that these are his dreams as well, and identified the following post-secondary schools he would like to apply to:
- Temple University
- UCLA
- Bowie University
- Morgan State
- Florida State
- University of Colorado in Boulder

L█████ is presently looking for scholarships and hopes to play sports at these schools. It is recommended that he continue to research schools. It is important that he consolidate his choices and he and his family need to visit each school to look at the facility and talk to an admissions counselor about the curriculum they offer. It is also important that L█████ talk to an administrator about their disability support system. L█████ will need to apply for accommodations through disability services to assist him with his academic classes.

**Tested:** L█████ was asked to do the DISCOVER Interest Survey. Unfortunately, he did not attend the last day and the testing was not complete. If he would like to return to the Center to complete this software program about careers he certainly would benefit from the results. Additional ways to explore careers are through other types of resources. They will help L█████ learn about careers through the following Internet sites. The following will get him started:
O*NET
Online: http://online.onetcenter.org/
In print:

2

Farr, J.M., Ludden, L., & Mangin, P. (1998). O*NET Dictionary of Occupational Titles, 1998-1999 Edition. Indianapolis, IN: Jist Works, Inc.

Occupational Outlook Handbook
Online: http://www.bls.gov/oco/
In print: Occupational Outlook Handbook, 2000-2001 Edition, published by the U.S. Department of Labor, Bureau of Labor Statistics.

America's Career Info Net includes videos on many of the positions in the data bank,
Online: http://www.acinet.org/acinet/

A career exploration and inspiration web site where experienced workers share their motivations, basic skills and advice with those just entering the field.
Online: http://www.jobprofiles.org/

## Work Sample Results

L.██ was somewhat cooperative during the assessment process. He appeared to have his own agenda and needed assistance to get him started on tasks where he lacked exposure. Instructions were given in all types of modalities and L██ appeared to have more success when the evaluator was physically near to him and available to fill in the instructions when he lacked understanding of the task. On tasks that were of high interest (chef, and air conditioning and refrigeration) L██ was much more attentive but again relied on others to assist him with the task. When given tasks that appeared to he challenging, (cosmetology and simulated assembly); where there was a finished product; were repetitive and required independent performance, he quit, stating that he was no longer interested or lacked the desire to stand and perform the task for another ten minutes.

**Simulated Assembly:** This is a timed task that assesses L██'s bi-manual dexterity, gross motor skills and stamina. L██ was asked to make assemblies using two washers and a pin and place them on a board that moves in a circular motion. He is asked to use both hands to manipulate the pieces and stand for twenty minutes. L██'s score was not recorded as he quit after ten minutes.

**Cosmetology Work Sample:** L██ began to listen to the audio-visual tape and began the tasks. About ten minutes into the task, he left it stating that he was no longer interested.

**Cooking Work Sample:** L██ did a good job with this task. He began by reading the recipe (written on 4th grade level) and asked for one-on-one instruction with tasks he lacked familiarity with. His brownies were very good as he shared them with the rest of the attendees.

**Air Conditioning and Refrigeration:** L██ watched another student complete this work sample and decided to try it. He began to listen to the audio-visual instructions but quickly requested assistance. The student who had just completed it previously offered some assistance and L██ accepted it well. L██ saw a pair of gloves on the worktable and was determined to wear them as he began to measure, mark and cut the copper tubing. L██'s peer told him it was unnecessary to wear the gloves but L██ persisted until they were a hindrance to his performance. Unfortunately time became a factor as L██ had another appointment for the day and had to leave.

## Learning and Work Styles Results

**Expressed:** L██ believes that he learns best when someone tells and shows him how to do a task. As observed he also prefers a global view then step-by-step directions until he has learned the task. Other work preferences are;

  a. Prefers moving around
  b. Prefers a structured environment
  c. Prefers routine tasks
  d. Prefers to work independently

3

c.  Prefers to work within a team

**Observed:**  During the assessment L[____]'s observed learning style was:
* Bodily/Kinesthetic--likes a task that is physical, structured and given time to over-learn
* Visual/Spatial--learns best visually and organized. He will need diagrams, templates, color codes pictures
* Interpersonal--needs one-on-one interaction within a group or supervisor until task is learned
* Needs prompts and cues for multi-step directions
* Demonstration with a model whenever possible

### Recommendations

L[____] should continue to work within the community.  Job placements need to have at its focus, finding a job that matches his expressed interests (sports/recreation/coaching, prep cooking,) and utilizes L[____]'s individual strengths and assets.

➢ **Situational Assessments:** L[____] is encouraged to learn about required job duties, education, training for experience, rate of pay, benefits and job outlook of his job choice.  Active methods of obtaining information about specific jobs or careers include situational assessments and/or informational interviews. Situational assessments involve placement on an actual job site to provide hands-on experience on all aspects of the position. To determine if situational assessments can be arranged through the DCPS, L[____] is encouraged to contact his guidance counselor. This also can be accomplished beyond high school, through the Rehabilitation Services Administration – see below.

➢ **Volunteering:**  An additional method to obtain hands-on experience is to volunteer.  L[____] would not only gain a better understanding of the job or jobs involved, but volunteer experience is also helpful to list on resumes, college applications, scholarship applications, etc.  During volunteer experiences, L[____] is encouraged to try out accommodations and supports when identified and available.  It is important that L[____] understand his disability to the best of his ability and the compensatory strategies he can develop so that he can increase his knowledge base and ask for assistance when needed.  This is especially important if he attends a post-secondary institution. He will need to take a copy of his high school IEP with him to prove his disability and request accommodations that might include:
* Tape recorder to tape class lectures
* Note taker
* Extended test time
* Extended time to turn in projects

➢ **Job Placement:**  L[____]'s strongest assets include, but are not limited to, his polite, pleasant and cooperative demeanor, good manual dexterity, whole body movement, and gross motor dexterity.  It is recommended that the worksite L[____] is assigned be compatible with certain characteristics:
  o  Choose a job of high interest with frequent interaction with others who can assist and praise his performances.
  o  Learn the tasks by doing the tasks
  o  Multi-step directions that are short explanations with a demonstration
  o  Provide consistent reinforcement and encouragement
  o  Provide work within a team
  o  Provide consistent opportunities for Larry to work independently so that he can begin to rely on his own abilities and strengthen his self-esteem.
  o  Provide an organized workstation. Keep schedules and duties consistent. Minimize clutter, noise and other distractions.  Arrange materials in order of use, Define work routine and divide complex work into sections.
  o  Provide both structure and supervision dealing with content and interpersonal skills.
  o  L[____] will need a mentor to assist him through the interviewing process and review (with him) work expectations, rules and regulations both on and off the job.

4

Before L█████ graduates from school it is important that he receive career guidance or attend career classes. If not, then the following career skills need to be incorporated into his class lesson plans:

1. How to write personal information on an application
2. Complete a working resume that he can add to every six months
3. Investigate how to find and keep a job in the community
4. Pre-interview, interview, and post-interview skills through role playing and videoing
5. Visit different types of work environments and training programs including Community College (Prince George's Community College or Montgomery College, and/or University of the District of Columbia.

L█████ appears to be more reactive to life situations. It is recommended that he participate in cognitive behavior therapy where emphasis might be on learning and developing decision-making strategies to be used when planning his career goals and life choices.

Larry's family will need to be familiar with adult service agencies. Rehabilitation Services Administration (202) 442-8469 can help with job placement and training once L█████ leaves high school. L█████ would be a good candidate for RSA's Work Adjustment program.

5

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.
INDIVIDUALIZED EDUCATIONAL PROGRAM

### I. IDENTIFICATION INFORMATION

Student Name: Last _Carter_ First: _Larry_ MI: __
StudentID: _9001554_ Soc. Sec. No.: _5792190_ Age: _16_ Grade: _11_
Gender: _M_ Date of Birth: _____ Ethnic Group: _Black_
Address: _____
☐ Non-attending
Attending School: _Rock Creek Academy_ Home School: _Dunbar_
☐ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS
Parent: _Angela Braxton_
Address of: ☑ Parent ☐ Guardian ☐ Surrogate
_____
Telephone: Home _____ Telephone: Work ____

## II. CURRENT INFORM
Date of IEP Meeting: _9/26/2006_
Date of Last IEP
Meeting: _6/17/2006_
Date of Most Recent _6/2/2003_
Eligibility Decision:
Purpose of IEP Conference:
☐ Initial IEP        ☑ Revi
☐ Requested Eval     ☑ 3yr F
Indicate Level of Standardized As
ADDENDA TO BE ATTACHED A
Check the appropriate box(es)
☐ BEHAVIOR          ☑ E:
☑ TRANSPORTATION    ☐ TI

### III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements | To be completed by Office of Bilin Education English and Math Profi Assessment |
|---|---|---|---|---|---|
| Student | English | English | English | Native Language | Oral N/A |
| Parent | English | English | English | Native Language | Rdg./Written |
| Home | English | English | English | Native Language | Instrument Date |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | SpEd | Total | FREQUENCY Hr./Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | # |
|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | ☐ | ☑ | 25 | hr | W | Special Educator | 09/26/2006 | 11 |
| Psychological Counseling | ☐ | ☑ | 2.5 1.5 hrs. | | W | Psychologist/Social Worker | 09/26/2006 | 11 |
| Substance Abuse Counsel | No Total | | 27.5 Hours Per Week | 1.0 hrs | Wk | Substance Abuse Counselor | 09/26/06 | 11 |

### V. DISABILITY(IES) Other Health Impairment
☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Serv
☐ 0-20% ☐ 21-60% ☑ 61-100%
Percent of time NOT in Regular Education Setting  100%

### VI. IEP TEAM (Participants in the development of the IEP)
Print and sign your name below:

| | |
|---|---|
| Ms. Braxton, Parent | _Angela Braxton_ |
| Larry Cooper, Student | _Larry Cooper_ |
| Ms. Mills, Educational Advocate | |
| Ms. Johnson, Transition Specialist | |
| Mr. Clark, Homeroom Teacher | |
| Ms. Page, IEP Coordinator | |
| Mrs. Bright, CAO | _Samantha M. Bright_ |
| Mr. Smith, Substance Abuse Counselor | _Anthony Smith (SU)_ |
| Mrs. Gilliam, Clinical Therapist | _Melanie Gilliam LGSW_ |

☐ _I AGREE_ with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of th
consent to the implementation of the services in the IEP. I have received a copy of his procedural safeguards and parent rights pertaining
education.
Parent/Guardian Signature _____ Date _____

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINITATION
## SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in regular education?

⊙ No

Explanation for removal out of regular education classroom.

Student's needs cannot be met in the general educational setting.

## X. SUPPLEMENTAL AIDS AND SERVICES

| CLASSROOM NEEDS (Do not name products or companies.) | SETTING | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNIN (mm/dd/ |
|---|---|---|---|---|---|---|---|
| | GenEd | SpEd | Total | Hr.Min | D/W/M | | |

Check and list modifications and/or accommodations for testing: ☐ None Needed

| | |
|---|---|
| Timing/Scheduling: | Extended time |
| Setting: | Small group setting |
| Presentation: | Repeated directions |
| Response: | Extra Response time |
| Equipment: | |

## XI. STATE AND DISTRICT ASSESSMENTS

☐ Level I — Tested with non-disabled peers under standard conditions without accommodations.

☑ Level III — (Describe non-uniform conditions for levelII) Tested under non-standard conditions with permissible accommodations.

☐ Level V — Portfolio:

☐ Level II — (Describe accommodations for level II) Tested under standard conditions with speci accommodations.

☐ Level IV — (Describe the alternative assessment)

## XII. AREAS REQUIRING SPECIALIZED INSTRUCTION AND RELATED SERVICES:

☑ Reading          ☐ Physical          ☐ Transition          ☐ Language Arts/Eng

☑ Mathmatics       ☑ Social Emotional  ☐ Vocational          ☐ Social Sciences

☑ Written Expression ☐ Physical Development ☐ Independent Living ☐ Biolocial & Physica

☐ Other            ☐ Speech/Language    ☐ FineArts

☐ None .  Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFEC |
|---|---|---|
| General Ed Setting | ○ Accept ○ Reject | Continued school failure |
| Combination setting | ○ Accept ○ Reject | Continued school failure |
| Out of general education | ⊙ Accept ○ Reject | Impact on self-esteem |

Modifications(s)/Accommodation(s) to address the harmful effects:

Student's needs will be met in and out of the class environment

Location for Services: Rock Creek Academy

**Date Developed:** _9/28/2006_

## DCPS TRANSITION SERVICES PLAN

Note: The MDT determines if the IEP must include a statement of transition service needs which focuses on the Courses of study if the student during the implementation of the IEP. Furthermore, the MDT must include a detailed transition plan for a student who will turn 16 during the imp of the IEP.

### I. Record student's post-secondary goals and interests.

|  |  |
|---|---|
| **Employment:** | Expressed interest in Law./NBA |
| **Community Participation:** | _Completed at Beacon House Comm. Ministry_ |
| **Post-Secondary Education and Training:** | _Wants to attend Temple Univ._ |
| **Independent Living:** | _Wants to live out of state._ |

### II. Courses of study leading to student's post-high school goals

| Grade of School Year | Courses of Study |
|---|---|
| 2005/06 | Diploma Tract, 11th Grade |

### III. Transition Services Needed.

Evaluate the student's present level of performance in the following areas: Academic, Career Courses, Commu based Training, Supported or Competitive Employment, Communicaiton, Independent Living Skills, Community Transportation, Employability Skills, Social Skills, Community Resources, Educational, Financial, Career Traini Community-Based Instruction, Skill/Trade Training, Vocational, or Social Relationships.

| Transition Services | Coordinated Activities and Strategies | Agency Responsi |
|---|---|---|
| Employment<br><br>If service is not needed provide explanation. | Student will participate in professional mentorship program. Student will research career areas of interest. | RCA |
| Community Participation<br><br>If service is not needed provide explanation. | Student will complete 100 hours of community service to graduate. Coordinate with guidance counselor. | RCA |
| Post - Secondary Education and Training<br><br>If service is not needed provide explanation. | Student will researcg schools that offer classes of interest. He will participate in college fairs. | RCA |
| Independent Living<br><br>If service is not needed provide explanation. | He will participate in transition classes at RCA. | RCA |
| Daily Living Skills<br><br>If service is not needed provide explanation. | Skills are age appropriate as of this update. | RCA |
| Functional Vocational Evaluation<br><br>If service is not needed provide explanation. | | |

| Other | | | | | |
|---|---|---|---|---|---|

| State Test Requirements | | Area | Date Taken | Score Received |
|---|---|---|---|---|

**IV.**

| Projected Exit Category (check one) | High School Diploma Status | | Projected E> |
|---|---|---|---|
| ☑ DC High School Diploma | 11.5 | # Credits Earned toward graduation | 6/15/2 |
| ☐ High School Certificate at age 21" | | | |
| ☐ High School Certificate prior to age 21 | | # Community Service Hours Completed | |

**V.** *Identify any other agencies likely to be responsible for providing or paying for specific transition servic*
Examples of Agency Linkages Needed for Transition
- Rehabilitation Services Administration (RSA)
- Mental Retardation and Developmental Disabilities Administration (MRDDA)
- Commission on Mental Health Services (CMES)
- UDC or other higher education Institutions

| Agency | Agency Representative | Telephone Number | Purpose of Contact |
|---|---|---|---|
| CPDC | Melissa Hensel | 202-832-0600 | Voc. Assessment |