**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|                          |    |                                    |
|--------------------------|----|------------------------------------|
| Angela Braxton,          | :  |                                    |
|                          | :  |                                    |
|                          | :  |                                    |
| Plaintiff,               | :  |                                    |
|                          | :  |                                    |
| v.                       | :  | **Civil Action No. 07-0632 (CKK)** |
|                          | :  |                                    |
|                          | :  |                                    |
| District of Columbia,    | :  |                                    |
|                          | :  |                                    |
| Defendant.               | :  |                                    |

---

**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

On January 4, 2007, an administrative hearing officer's decision ("HOD") was issued pursuant to the Individuals With Disabilities Education Improvement Act of 2004 20 U.S.C. §§1400 et seq. ("IDEIA"), concerning student L.C. Record ("R") p. 2. The issue presented and resolved was "Did DCPS deny a Free Appropriate Public Education ("FAPE") to the student by failing to conduct and review evaluations in all areas of suspected disability?" R. p. 3. Based on the evidence submitted and oral presentations at the hearing on December 22, 2006, the hearing officer denied Plaintiff's request for independent evaluations and an Individual Education Plan ("IEP") meeting. R. p. 5.

In her Motion for Summary Judgment ("Motion")(p. 1), Plaintiff seeks: 1) a declaration that DCPS violated the IDEIA and denied L.C. a FAPE by failing to perform a clinical evaluation, 2) an order that DCPS perform that evaluation, and 3) an Order that DCPS convene an IEP meeting, following the evaluation, to update L.C.'s IEP

and to determine the appropriate compensatory education to compensate L.C. for DCPS violations.

**I.    Declaratory Relief is not available under the IDEIA.**

The Complaint bases jurisdiction on 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1331. Parents who are "aggrieved by" a hearing officer's decision may bring a civil action in either state or federal court. 20 U.S.C. § 1415(i)(2).  However, the IDEIA does not provide for declaratory relief. S.G. v. District of Columbia, Civil No. 06-0317, (D.D.C. August 8, 2007) (Memorandum Opinion p. 14). See Kaseman v. District of Columbia, 329 F. Supp. 2d 20, 32 (D.D.C. 2004) (denying plaintiffs' request for a declaratory judgment because IDEA does not provide for declaratory relief).

Thus, Plaintiff's first request for relief should be denied because this Court is without jurisdiction to order such relief.

**II.    The hearing officer's decision should be affirmed.**

**a. Plaintiff's argument that a waiver occurred is unsupported.**

In her Motion (p. 7), Plaintiff contends that DCPS waived any argument that the failure to evaluate D.C. resulted in a denial of FAPE because DCPS did not raise the necessity of the evaluations or the denial of FAPE in its response to the administrative due process complaint.  DCPS did state in its response that it "was attempting to have them completed." R. p. 10.

IDEIA itself does note that that a response to a complaint shall include: "(1) an explanation of why the agency proposed or refused to take the action raised in the complaint. . . ."  20 U.S.C. §1415 (c)(2)(B)(i).

Plaintiff does not offer any legal authority, standard, or test, to demonstrate that a waiver occurred, which alone is grounds for dismissal of the argument. The failure to develop an argument constitutes a waiver. Blise v. Antaramian, 409 F.3d 861, 866 n.3 (7th Cir. 2005), citing Kramer v. Banc of America Securities, LLC, 355 F.3d 961, 964 n. 1 (7th Cir.2004) ("We have repeatedly made clear that perfunctory and undeveloped arguments that are un-supported by pertinent authority, are waived (even where those arguments raise constitutional issues).") (quoting United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir.1991)).

Therefore, Plaintiff's waiver argument should be rejected.

**b.  Plaintiff has not shown by a preponderance of the evidence that the hearing officer was wrong.**

Plaintiff's motion further alleges that the hearing officer was wrong in finding the failure to perform the clinical evaluation was a procedural violation of the IDEIA, arguing instead that the failure of DCPS to perform the clinical evaluation caused a substantive denial of FAPE. Motion p. 8-9. Plaintiff contends that while demonstrating the substantive harm that occurred is "impossible," a denial of FAPE occurred because L.C. was denied educational services. Motion p. 10. In support of her argument, Plaintiff alleges, "It is impossible to determine exactly what the IEP team would prescribe for L.C. based on the evaluations, but those evaluations that have now been performed recommend instruction and services beyond what [L.C.'s] current IEP prescribes." Motion p. 9.

Pointing to other evaluations and their recommendations is not enough for Plaintiff to show harm resulting from this evaluation not being complete. While it may be true that Plaintiff cannot determine exactly what would have been recommended,

Plaintiff could have at least set forth the facts surrounding the need for the evaluation, and the reason it was recommended.

Instead, Plaintiff simply points to other evaluations and their recommendations implying that a clinical evaluation would also reveal other such recommendations unknown at this time. For example, Plaintiff cites a recommendation pursuant to the psycho-educational evaluation, stating that "the latest technology. . .including a computer . . . " is not in L.C.'s current IEP. Motion p. 9. Plaintiff also cites a recommendation that L.C. receive "a curriculum rich in real world type Math assignments . . ." Motion p. 9. However, there is no evidence that RCA was not already providing these services.

Plaintiff must show harm for a procedural violation to have denied a student FAPE. Kingsmore ex rel. Lutz v. District of Columbia, 466 F. 3d 118, 199 (D.C. Cir. 2006) (per curiam). In T.T. v. District of Columbia, Civil No. 06-0207 (July 23, 2007) (Memorandum Opinion p. 14), citing Lesesne v. District of Columbia, 447 F. 3d 828, 834 (D.C. Cir. 2006), this Court has found that procedural errors do not necessarily amount to a denial of FAPE, unless "substantive harm has occurred." Id. In T.T., DCPS' Prior Notice of Placements (written notice to parents before school initiates or refuses a change in identification, evaluation, or placement required by 20 U.S.C. 1415(b)(3)) fell short of the specificity required by the IDEIA to provide a thorough explanation of placement. "These minor procedural failings, however, do not necessarily entitle plaintiffs to relief. Rather, Plaintiffs must show that the procedural violations affected [the student's] substantive rights." Id.

Plaintiff simply assumes that since the other evaluations made recommendations, the clinical evaluation (and its assumed recommendations) deprived L.C. of instruction or

services that were due.  Motion p.10.  However, these assumptions are not supported.

Using Plaintiff's own words, "it remains impossible to say what harm L.C. is

experiencing. . . ." Motion p. 12. The party challenging the hearing officer's

determination bears the burden of persuading the court that the hearing officer was

incorrect.  Angevine v. Smith, 959 F.2d 292, 295 (D.C. Cir.1992); Kerkam v. McKenzie,

862 F.2d 884, 887 (D.C. Cir. 1988); Lyons v. Smith, 829 F. Supp. 414, 417 (D.D.C.

1993).  But, Plaintiff has not shown by a "preponderance of the evidence" that the

hearing officer's decision in this case was wrong.  Gellert v. D.C. Pub. Sch, 435 F. Supp.

2d 18, 24 (2006).

Moreover, on February 15, 2007, a clinical evaluation was attempted by DCPS,

even though the HOD did not require it. Because L.C. did not provide enough responses

to one of the clinical measures, however, the test results could not be scored, thus

rendering the report inconclusive. Exhibit 1.  Mr. Nadjai Plowden, MS, who performed

the evaluation, reported that L.C. was uncooperative in providing additional information

despite repeated requests to complete the evaluation over the course of several months

(February-June 2007). Exhibit 1.  Finally, L.C. graduated from RCA with a regular high

school diploma on June 22, 2007.

Accordingly, where Plaintiff has failed to demonstrate any substantive harm from

a clinical evaluation not having been completed, the hearing officer's decision should be

affirmed because procedural errors generally do not amount to denials of FAPE.

**c. The hearing officer did not err in refusing to order evaluations.**

Plaintiff makes a general argument that the hearing officer should have ordered

evaluations despite any procedural or substantive errors on the part of DCPS. "The

hearing officer's refusal to order anything at all left Ms. Braxton powerless to ensure that

her son is properly evaluated, and therefore provided an appropriate IEP." Motion p. 13.

     The IDEIA and its implementing regulations allow for evaluations of students in

various circumstances.  For example, initial evaluations may be called for where a

student is suspected to have a learning or behavioral disability, or a re-evaluation may be

due after three years.  Sometimes, the statute allows for a parent to make a request for an

independent evaluation. [1]

---

[1] **34 C.F.R. § 300.301:** Initial evaluations.

  (a) General. Each public agency must conduct a full and individual initial evaluation, in accordance with §§ 300.305 and 300.306, before the initial provision of special education and related services to a child with a disability under this part.

(b) Request for initial evaluation. Consistent with the consent requirements in § 300.300, either a parent of a child or a public agency may initiate a request for an initial evaluation to determine if the child is a child with a disability.

(c) Procedures for initial evaluation. The initial evaluation--

(1)(i) Must be conducted within 60 days of receiving parental consent for the evaluation; or

(ii) If the State establishes a timeframe within which the evaluation must be conducted, within that timeframe; and

(2) Must consist of procedures--

(i) To determine if the child is a child with a disability under § 300.8; and

(ii) To determine the educational needs of the child.

(d) Exception. The timeframe described in paragraph (c)(1) of this section does not apply to a public agency if--

(1) The parent of a child repeatedly fails or refuses to produce the child for the evaluation; or

(2) A child enrolls in a school of another public agency after the relevant timeframe in paragraph (c)(1) of this section has begun, and prior to a determination by the child's previous public agency as to whether the child is a child with a disability under § 300.8.

(e) The exception in paragraph (d)(2) of this section applies only if the subsequent public agency is making sufficient progress to ensure a prompt completion of the evaluation, and the parent and subsequent public agency agree to a specific time when the evaluation will be completed.

**34 C.F.R. § 300.302:** Screening for instructional purposes is not evaluation.

  The screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services.

**34 C.F.R. § 300.303:** Reevaluations.

  (a) General. A public agency must ensure that a reevaluation of each child with a disability is conducted in accordance with §§ 300.304 through 300.311--

(1) If the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or

(2) If the child's parent or teacher requests a reevaluation.

(b) Limitation. A reevaluation conducted under paragraph (a) of this section--

(1) May occur not more than once a year, unless the parent and the public agency agree otherwise; and

(2) Must occur at least once every 3 years, unless the parent and the public agency agree that a reevaluation is unnecessary.

Plaintiff seems to contend that evaluations are warranted in any and all circumstances. This is not true. Since no authority has been cited in her argument as to why this evaluation should be awarded, Plaintiff's argument should fail.

<u>CONCLUSION</u>

Plaintiff has not shown by a preponderance of the evidence that the hearing officer's decision in this case was wrong. Thus, the HOD issued should be affirmed. In any event, even if the hearing officer was wrong, Plaintiff's Motion should be denied since 1) no educational harm was demonstrated by L.C., 2) L.C. did not comply during an attempted clinical evaluation, and 3) L.C. ultimately graduated high school with a regular diploma, his claims should be rendered moot.

Respectfully submitted,

LINDA SINGER
Attorney General
for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Edward P. Taptich*
EDWARD P. TAPTICH [#012914]
Chief, Equity Section II

*/s/ Amy Caspari*
AMY CASPARI [#488968]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
September 28, 2007                    (202) 724-7794

---

**34 C.F.R. § 300.502(b)(1),** '[a] parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation by the public agency.'

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **Angela Braxton,** | : |
| | : |
| | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : **Civil Action No. 07-0632 (CKK)** |
| | : |
| | : |
| **District of Columbia,** | : |
| | : |
| **Defendant.** | : |

_____

### DEFENDANT'S STATEMENT OF PLAINTIFF'S IDENTIFIED MATERIAL

### FACTS IN DISPUTE

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Undisputed.

6. Undisputed.

7. Undisputed.

8. Undisputed.

9. Disputed. The vocational assessment was completed on November 1, 2007.

   Exhibit 1.

10. Disputed. The psycho-educational evaluation was completed on January 16,

    2007.  Exhibit 1.

11. Undisputed.

12.    Disputed. DCPS made several attempts to complete a clinical evaluation.

However, L.C. made it impossible to complete, by refusing to answer the test

questions.  Thus, DCPS **could not** complete the evaluation.  Exhibit 1.

13.    Undisputed.

Respectfully submitted,

LINDA SINGER
Acting Attorney General
for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Edward P. Taptich*
EDWARD P. TAPTICH [#012914]
Chief, Equity Section II

*/s/ Amy Caspari*
Amy Caspari [#488968]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-7794

September 28, 2007



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Angela Braxton, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    Civil Action No. 07-0632 (CKK) |
| | : |
| District of Columbia, | : |
| | : |
| Defendant. | : |
| | : |

## <u>DECLARATION OF KEREN PLOWDEN, MA</u>

I, Keren Plowden, MA, do hereby declare under penalty of perjury that the foregoing is true and correct:

1. I am a citizen of the United States of America, and over the age of 18, I have personal knowledge of the facts contained herein.

2. I have earned a bachelors degree in psychology, a masters degree in education and human development, and am currently obtaining a doctorate degree in special education at The George Washington University. I hold a standard teaching license in the District of Columbia for special education (K-12).

3. I am the Executive Director of Student Services at Rock Creek Academy ("RCA"). My job responsibilities include reviewing student referrals and making admissions decisions, managing student data and school records, ensuring overall compliance of educational and related services for all students attending RCA, coordinating and supervising evaluation services for students attending RCA, providing information and testimony relevant to due process complaint issues for current and referred students and other duties as assigned.

4. L.C. was a 17 year old student who attended RCA and met the requirements for graduation on June 22, 2007.

5. I am familiar with L.C.'s special education services including those detailed in his IEP dated September 26, 2006.

1

6. On November 1, 2006, a vocational evaluation of L.C. was completed.

7. On January 16, 2007, a psycho-educational evaluation of L.C. was completed.

8. On February 15, 2007, a clinical evaluation was also attempted. However, because L.C. did not provide enough responses to one of the clinical measures the test results could not be scored thus rendering the report inconclusive.

9. Nadjai Plowden, MS who performed the clinical evaluation reported that L.C. was uncooperative in providing additional information despite repeated requests to complete the evaluation over the course of several months (February-June 2007)

10. Due to L.C.'s lack of compliance, a clinical evaluation was never completed.

11. L.C. graduated from RCA, earning a regular High School diploma on June 22, 2007.

12. In addition, the attached summary report from Nadjai Plowden regarding the clinical examination indicates the attempts made at testing L.C. maintained by RCA in the ordinary course of business.

9/27/07
**Date**                          **Signature**



Rock Creek Academy, Inc.
4401 Connecticut Ave., NW
Washington, DC 20008
202.378.1400

## PSYCHOLOGICAL EVALUATION REPORT
### DRAFT

**Name:** Larry Cooper      **School:** Rock Creek Academy
**DOB:** 1/12/1990      **Grade:** 12
**Age:** 17 years, 0 months      **Examiner:** Nadjai Plowden, MS, Doctorial Psychology Intern
**DOE:** 2/15/2007      **DOR:** 2/20/2007 *Submitted 9/24/07*

## REASON FOR REFERRAL

Larry Cooper, a 17-year old, African American student was referred for a clinical psychological evaluation. This clinical evaluation will describe Larry's social, behavioral, and emotional functioning in order to develop his special education program.

## EVALUATION METHODS:

Records Review
Behavior Assessment Scales for Children, Second Edition (BASC-2), Parent Rating Scales-Child
Behavior Assessment Scales for Children, Second Edition (BASC-2), Teacher Rating Scales-Child
Behavior Assessment Scales for Children, Second Edition (BASC-2), Self Report-Child
Bender Visual Motor Gestalt Test (emotional indicators)
Draw-A-Person Test
Rorschach Inkblot Technique, attempted
Clinical Interview
Observations

## RELEVANT BACKGROUND INFORMATION:

Larry Cooper is a 17-year-old African American adolescent who is a student at Rock Creek Academy. He is receiving services at that location with the primary disability classification of Other Health Impaired. His most recent IEP (9/06) stipulated that Larry was to receive the following services each week, with times in parentheses: Specialized Instruction (25 hours), Psychological Counseling (1.5 hours), and Substance Abuse Counseling (1 hour).

This evaluator completed a psycho-educational battery of Larry in January of 2007. On the basis of his WAIS-III performance, Larry's verbal comprehension skills and his nonverbal reasoning abilities are comparable. Larry is a 17 year old male who completed the WAIS-III. His overall cognitive ability, as estimated by the Full Scale IQ, is in the Low Average range (FSIQ=81).On the Verbal scale, his score is in the Low Average range (VIQ = 83). Larry's Performance score is in the Low Average range (PIQ = 83).On the Perceptual Organization

Index, he performed in the Borderline range (POI = 78).Larry performed in the Low Average range on the Verbal Comprehension Index (VCI = 80). His verbal reasoning abilities, as measured by the Verbal IQ, are in the Low Average range and above those of approximately 13.0% of his peers (VIQ = 83, 95% Confidence Interval = 79-88).

Larry was also administered a set of tests from the W-J III Tests of Achievement. Direct comparisons can be made among Larry's achievement scores. These comparisons help determine the presence and significance of any strengths and weaknesses among his abilities. Larry's oral language skills are average when compared to the range of scores obtained by others at his age level. When compared to others at his age level, Larry's academic skills and his fluency with academic tasks are both within the low average range. His ability to apply those skills falls within the low range. Larry's performance is average in written language and written expression; and low average in reading, mathematics, and math calculation skills. No discrepancies were found among Larry's achievement areas.

While Larry's file contained no previous clinical evaluations – some of his therapists at High Roads did provide clinical updates pertaining to his emotional progress. Larry apparently was receiving group and individual therapy to address his impulsivity, anger management, and interpersonal skills. He also showed markedly divergent personality traits. He was viewed as being capable of earning the top behavioral levels but at other times was also capable of being defiant, disruptive, and disrespectful. It was noted that the poor behavior was often done when interacting with peers as it was written, "…he often appears to instigate negativity or disruptive behavior with peers." Over the course of his time at High Roads and his concurrent therapy he was able to master several goals including but not limited to; following directions the first time given; working on not arguing; making good choices and not being disrespectful to staff members.

It is of note to this evaluator that no other psychological or medical data was on file that addressed the basis of his designation of Other Health Impaired. As a result it is unknown at the time of this report the extent to which this disability still currently exists and or impacts Larry's academic and social emotional functioning. Previous records from High Roads also indicate that no data was on file and that that his diagnosis was unknown.

This clinical psychological evaluation will assist Larry's teachers to develop his curriculum in light of his present social, emotional and behavioral functioning.

**BEHAVIORAL OBSERVATIONS:**

Larry was evaluated at Rock Creek Academy in a quiet room with no outside distractions. He presented as a slightly oppositional and disinterested youth who was well dressed and showed notable apprehension on leaving his classroom and separating from his teacher stating, "Why do I have to do this stuff again?!"

During this session, he rarely smiled and seemed disinterested. Larry appeared bored as reflected by his frequent sighing. He initiated no spontaneous conversation yet maintained adequate eye contact. He also clearly understood the task at hand and needed no prompts to stay on task or complete the items. It is of particular note that Larry was reluctant to respond to the Rorschach cards and thus did not give enough responses to score the test. As a result this evaluation provides minimal information regarding Larry's social emotional functioning and should be interpreted with caution.

**TEST RESULTS AND INTERPRETATION:**

## Objective Personality Data

Behavior rating scales completed by his teacher and himself, and were used to screen for problems in Larry's social/emotional/ behavioral functioning. Rating scales sent to his home were not returned.

Mr. Thomas Clark, Larry's special education teacher completed the BASC-2 (Behavior Assessment System for Children, Second Edition) Teacher Rating Scale for Children Age 12-21. This checklist contains 139 questions that can be viewed in a clinical profile that indicates levels of hyperactivity, aggression, conduct problems, externalizing problems, anxiety, depression, somatization, internalizing problems, atypicality, withdrawal, attentional problems, learning problems, social skills, adaptability, functional communication, and leadership.

According to Mr. Clark Larry's Externalizing Problems composite-scale T score is 61, with a 90 percent confidence-interval range of 58-64 and a percentile rank of 88. Larry's T score on this composite scale falls in the At-Risk classification range. Larry's T score on Hyperactivity is 62 and has a percentile rank of 88. This T score falls in the At-Risk classification range. Mr. Clark feels that Larry often engages in a number of behaviors that may be adversely affecting other children in the classroom. At times, Larry is considered to be restless and impulsive, and has difficulty maintaining his self-control. Larry's T score on Conduct Problems is 68 and has a percentile rank of 93. This T score falls in the At-Risk classification range. His teacher feels that Larry sometimes engages in rule-breaking behavior, such as cheating, deception, and/or stealing. Mr. Clark also identified that Larry sometimes has difficulty controlling and maintaining his behavior and mood. Mr. Clark also noted that Larry, does not tend to act in a threatening or intrusive manner; has social and communication skills that are typical of others his age; able to control his reactions to environmental changes about as well as others his age; reacts to changes in everyday activities or routines in a manner that is typical of others his age; and is able to overcome stress and adversity about as well as do others his age. Some of the critical items identified by Mr. Clark include but are not limited to: Is easily annoyed by others – *Sometimes*; Smokes or chews tobacco at school - *Sometimes*; and hits other adolescents – *Sometimes*.

Larry completed a Behavior Assessment System for Children Self Report. Larry seemed to respond in a pattern that denied most problems. He reported that enjoys school about as much as others his age; engages in risky behaviors as often as others his age; reports having unusual thoughts and perceptions no more than others his age; reports having control over his life at a level that is typical for persons his age; reports anxiety-based feelings no more often than others his age; reports depressed feelings no more often than others his age; and reports feelings of inadequacy slightly less often than others his age. The only Critical Item identified of note was: I feel like my life is getting worse and worse - *Sometimes*.

## Projective Personality Data

Drawings and the Rorschach Ink Blot Technique were used to evaluate Larry's emotional functioning.

Larry's drawings were well below his grade and age level. However, he made it clear that he had no interest in drawing or cooperating with the projective components of testing. His Bender drawings contained indications of problems with insecurity and anxiety. His human figure drawing consisted of stick figures as he quipped, "I can't draw no way so why should I do it any better?" However the limited content suggested problems with aggression and a lack of control.

3

The Rorschach Inkblot Technique was administered to Larry in order to generate hypotheses about personality characteristics associated with his psychological functioning. However, Larry refused to give enough responses so that the Exner scoring system could be utilized. As a result a thorough synopsis pertaining to his personality could not be ascertained. The responses he did give were often the popular responses found when an individual is attempting to be overly conventional. Despite numerous attempts to cajole Larry into giving added responses he often stated, "I don't see nothing else. You can't make me see something if I don't see it!" Several attempts were made following the initial administration of this clinical battery to garner more responses, however, Larry refused to cooperate with said attempts.

**SUMMARY:**
Larry Cooper is a 17-year-old African American adolescent who is a student at Rock Creek Academy. He is receiving services at that location with the primary disability classification of Other Health Impaired. His most recent IEP (9/06) stipulated that Larry was to receive the following services each week, with times in parentheses: Specialized Instruction (25 hours), Psychological Counseling (1.5 hours), and Substance Abuse Counseling (1 hour).

This evaluator completed a psycho-educational battery of Larry in January of 2007. On the basis of his WAIS-III performance, Larry's verbal comprehension skills and his nonverbal reasoning abilities are comparable. Larry is a 17 year old male who completed the WAIS-III. His overall cognitive ability, as estimated by the Full Scale IQ, is in the Low Average range (FSIQ=81).On the Verbal scale, his score is in the Low Average range (VIQ = 83). Larry's Performance score is in the Low Average range (PIQ = 83).On the Perceptual Organization Index, he performed in the Borderline range (POI = 78).Larry performed in the Low Average range on the Verbal Comprehension Index (VCI = 80). His verbal reasoning abilities, as measured by the Verbal IQ, are in the Low Average range and above those of approximately 13.0% of his peers (VIQ = 83, 95% Confidence Interval = 79-88).

Larry was also administered a set of tests from the W-J III Tests of Achievement. Direct comparisons can be made among Larry's achievement scores. These comparisons help determine the presence and significance of any strengths and weaknesses among his abilities. Larry's oral language skills are average when compared to the range of scores obtained by others at his age level. When compared to others at his age level, Larry's academic skills and his fluency with academic tasks are both within the low average range. His ability to apply those skills falls within the low range. Larry's performance is average in written language and written expression; and low average in reading, mathematics, and math calculation skills. No discrepancies were found among Larry's achievement areas.

While Larry's file contained no previous clinical evaluations – some of his therapists at High Roads did provide clinical updates pertaining to his emotional progress. Larry apparently was receiving group and individual therapy to address his impulsivity, anger management, and interpersonal skills. He also showed markedly divergent personality traits. He was viewed as being capable of earning the top behavioral levels but at times was also capable of being defiant, disruptive, and disrespectful. It was noted that the poor behavior was often done when interacting with peers as it was written, "…he often appears to instigate negativity or disruptive behavior with peers." Over the course of his time at High Roads and his concurrent therapy he was able to master several goals including but not limited to; following directions the first time given; working on not arguing; making good choices and not being disrespectful to staff members.

4

According to Mr. Clark Larry often engages in a number of behaviors that may be adversely affecting other children in the classroom; is considered to be restless and impulsive, has difficulty maintaining his self-control; sometimes engages in rule-breaking behavior, such as cheating, deception, and/or stealing; sometimes has difficulty controlling and maintaining his behavior and mood. Mr. Clark also noted that Larry, does not tend to act in a threatening or intrusive manner; has social and communication skills that are typical of others his age; is able to control his reactions to environmental changes about as well as others his age; reacts to changes in everyday activities or routines in a manner that is typical of others his age; and is able to overcome stress and adversity about as well as do others his age

Larry's drawings also contain several images consistent with insecurity, anxiety, aggression, and a lack of control.

Larry failed to produced a valid record that should ordinarily provide reliable information about his personality functioning. . However, Larry refused to give enough responses so that the Exner scoring system could be utilized. As a result a thorough synopsis pertaining to his personality could not be ascertained. The responses he did give were often the popular responses found when an individual is attempting to be overly conventional. Despite numerous attempts to cajole Larry into giving added responses he often stated, "I don't see nothing else. You can't make me see something if I don't see it!" Several attempts were made following the initial administration of this clinical battery to garner more responses, however, Larry refused to cooperate with said attempts.

In summary, Larry appears to be a *heavily* defended and cautious youth. As a result he may often times behave in a manner in which he *follows* rather than *leads* so as to "fit-in." As he is at a pivotal age in his emotional development as well as burgeoning awareness of sexuality, alcohol, and drugs; he is at risk for putting himself in notable jeopardy should the need to "fit-in" supersede good judgment and learned values.

According to his current school placement, Rock Creek Academy, Larry has met the requirements for graduation and has earned his high school diploma. As a result the following recommendations are based on his post-secondary transition. It is the understanding of this evaluator that Larry is currently living in Miami and will be attending college (Johnson & Wales University) this Fall.


**DIAGNOSTIC IMPRESSIONS:**

The following diagnostic impressions are made on the basis of the limited information available from Larry and his teacher and past reports:

| Axis I   | Diagnosis deferred  |
|----------|---------------------|
| Axis II  | None                |
| Axis III | None                |
| Axis IV  | Scholastic concerns |
| Axis V   | 70                  |


**RECOMMENDATIONS:**

Based on these findings the following recommendations are made.

5

1. Should Larry chose to disclose his disability, support services should be provided through his campus disability office.

2. Larry should familiarize himself with the rights afforded to him under the Americans With Disabilities Act.

3. Larry would benefit from individual counseling services to help support his post secondary transition.

4. Should Larry choose to participate in therapy, services should also address areas of security, anxiety, and aggression.

Nadjai B. Plowden, MS, Doctorial Psychology Intern

Supervised by: Martha Ross Ozer, Ed.D, Psychologist
DC Psychology License # PSY 100168

6

# Exhibit 2

**Career Assessment Center**
MM Washington Career High School
Room 155
27 O Street, NW
Washington, DC 20001
Telephone #: 202.671.2875 Fax #: 202.673.7229

## Career Assessment Report

### Student Information

| | |
|---|---|
| **Name:** | **School:** Rock Creek Academy |
| **Address:** | **Address:** |
| **Phone #:** | **Phone #:** |
| **Date of Birth:** | **Referral Person:** Sherrie Waut |
| **SS #:** 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 | **Assessment Dates:** 10/31-11/1/06 |
| **Grade:** 12th | **Evaluator:** _Mary V. Piatt_ |
| | Mary V. Piatt, CVE |

**Tests Given:** Self-assessment Survey, Cooking Work Sample, Air Conditioning and Refrigeration Work Sample, Simulated Assembly, (quit), Cosmetology Work Sample (quit), and SKILTRAN.

### Reason for Referral

L___ participated in a 5-hour, level 3 career assessment to assist in identifying appropriate career interests, skills, and aptitudes and the level of support and/or training that will be necessary for successful school programming and future employment.

L___ missed about three hours of assessment and should consider returning one day to complete a thorough computer search of his top career choices. For his convenience, the Appendix portion of this report provides a custom report of his four interest areas. (athlete, chef, lawyer and business owner.)

### Student Vocational Strengths

- Likes tasks that are competitive and demonstrates his dexterity abilities and physical stamina.
- Quiet, good communication skills when asked a series of questions
- Has excellent ability to work with his hands, separately and bi-manually, with and without tools
- Larry prefers tasks of high interest.

### Student Vocational Needs

- L___ does not always "hear" or attend to the full instructions. Appears to listen to get an indication of what the task is about then goes ahead with the task. When he runs into difficulty will call out for assistance. Not attentive to the fine details.
- L___ prefers physical movement rather than sitting or standing for long periods of time. Consequently, L___ will need breaks or a period of time to move around.
- L___ quit several work samples, preferring to go on to another task as he appeared to lose interest. L___ will need to continue with guidance counseling to assist him in understanding who he is and what are his interests, goals and potential achievements. Without self-awareness he will have difficulty developing the confidence to try new possibilities.
- Appears to be somewhat anxious in a new learning situation, with need supervision until task is learned.

1

- L▓▓ will need multi-sensory instructions and supports when he enrolls in a job-training program or a college program that relates to his career interests.
- Will need to continue to explore career interests and opportunities through hands-on experiences.
- In addition to exploring career opportunities and acquiring the basic skills and knowledge of a given occupation, L▓▓ will need to learn how to communicate his ideas, listen to others, organize his life so that he is where he needs to be on any given day; and take responsibility for his performance.

### Work History

L▓▓ was a recreational aide at the Beacon House during the summer of 2005. He got the job through the Summer Youth Program. His duties included childcare services where his major responsibilities were to watch the children, feed them meals, and play games. He especially liked the job as it was at the neighborhood rec center where most of his co-workers were his friends and he got paid. L▓▓ also liked his boss as he was the football coach.

### Vocational Interests

Expressed: L▓▓ was asked to describe his dream job(s). He stated that he would like to be a professional basketball player with the NBA, own a club in DC, and become a lawyer. After a brief discussion L▓▓ also added his interests in culinary arts.

L▓▓ did identify three cluster areas with four specific occupations:
- Sales and Distribution -- Entrepreneur, business manager, warehouse supervisor, stock clerk.
- Sports and Entertainment -- Basketball player, athletic coach
- Crafts -- Culinary arts, chef, prep cook
- Lawyer

(Appendix A., located at the back of this report, describes each of these careers in detail.)

Family Goals: L▓▓ was asked to describe his parents' goals for him. He emphasized that his mother has the most influence on him and she would like him to graduate from high school and go to college. L▓▓ concurred that these are his dreams as well, and identified the following post-secondary schools he would like to apply to:
- Temple University
- UCLA
- Bowie University
- Morgan State
- Florida State
- University of Colorado in Boulder

L▓▓ is presently looking for scholarships and hopes to play sports at these schools. It is recommended that he continue to research schools. It is important that he consolidate his choices and he and his family need to visit each school to look at the facility and talk to an admissions counselor about the curriculum they offer. It is also important that L▓▓ talk to an administrator about their disability support system. L▓▓ will need to apply for accommodations through disability services to assist him with his academic classes.

Tested: L▓▓ was asked to do the DISCOVER Interest Survey. Unfortunately, he did not attend the last day and the testing was not complete. If he would like to return to the Center to complete this software program about careers he certainly would benefit from the results. Additional ways to explore careers are through other types of resources. They will help L▓▓ learn about careers through the following Internet sites. The following will get him started:
    O*NET
    Online: http://online.onetcenter.org/
    In print:

2

Farr, J.M., Ludden, L., & Mangin, P. (1998). O*NET Dictionary of Occupational Titles, 1998-1999 Edition. Indianapolis, IN: Jist Works, Inc.

Occupational Outlook Handbook
Online: http://www.bls.gov/oco/
In print: Occupational Outlook Handbook, 2000-2001 Edition, published by the U.S. Department of Labor, Bureau of Labor Statistics.

America's Career Info Net includes videos on many of the positions in the data bank.
Online: http://www.acinet.org/acinet/

A career exploration and inspiration web site where experienced workers share their motivations, basic skills and advice with those just entering the field.
Online: http://www.jobprofiles.org/

## Work Sample Results

L____ was somewhat cooperative during the assessment process. He appeared to have his own agenda and needed assistance to get him started on tasks where he lacked exposure. Instructions were given in all types of modalities and L____ appeared to have more success when the evaluator was physically near to him and available to fill in the instructions when he lacked understanding of the task. On tasks that were of high interest (chef, and air conditioning and refrigeration) L____ was much more attentive but again relied on others to assist him with the task.   When given tasks that appeared to be challenging, (cosmetology and simulated assembly); where there was a finished product; were repetitive; and required independent performance, he quit, stating that he was no longer interested or lacked the desire to stand and perform the task for another ten minutes.

**Simulated Assembly:** This is a timed task that assesses L____'s bi-manual dexterity, gross motor skills and stamina. L____ was asked to make assemblies using two washers and a pin and place them on a board that moves in a circular motion. He is asked to use both hands to manipulate the pieces and stand for twenty minutes. L____'s score was not recorded as he quit after ten minutes.

**Cosmetology Work Sample:** L____ began to listen to the audio-visual tape and began the tasks. About ten minutes into the task, he left it stating that he was no longer interested.

**Cooking Work Sample:** L____ did a good job with this task. He began by reading the recipe (written on 4th grade level) and asked for one-on-one instruction with tasks he lacked familiarity with. His brownies were very good as he shared them with the rest of the attendees.

**Air Conditioning and Refrigeration:** L____ watched another student complete this work sample and decided to try it. He began to listen to the audio-visual instructions but quickly requested assistance. The student who had just completed it previously offered some assistance and L____ accepted it well. L____ saw a pair of gloves on the worktable and was determined to wear them as he began to measure, mark and cut the copper tubing. L____'s peer told him it was unnecessary to wear the gloves but L____ persisted until they were a hindrance to his performance. Unfortunately time became a factor as L____ had another appointment for the day and had to leave.

## Learning and Work Styles Results

Expressed – L____ believes that he learns best when someone tells and shows him how to do a task. As observed he also prefers a global view then step-by-step directions until he has learned the task. Other work preferences are:

    a.  Prefers moving around
    b.  Prefers a structured environment
    c.  Prefers routine tasks
    d.  Prefers to work independently

3

    c.  Prefers to work within a team

**Observed:** During the assessment L▮▮▮'s observed learning style was:
- Bodily/Kinesthetic--likes a task that is physical, structured and given time to over-learn
- Visual/Spatial--learns best visually and organized. He will need diagrams, templates, color codes pictures
- Interpersonal--needs one-on-one interaction within a group or supervisor until task is learned
- Needs prompts and cues for multi-step directions
- Demonstration with a model whenever possible

<u>Recommendations</u>

L▮▮▮ should continue to work within the community. Job placements need to have at its focus, finding a job that matches his expressed interests (sports/recreation/coaching, prep cooking,) and utilizes L▮▮▮'s individual strengths and assets.

➢ **Situational Assessments:** L▮▮▮ is encouraged to learn about required job duties, education, training or experience, rate of pay, benefits and job outlook of his job choice. Active methods of obtaining information about specific jobs or careers include situational assessments and/or informational interviews. Situational assessments involve placement on an actual job site to provide hands-on experience on all aspects of the position. To determine if situational assessments can be arranged through the DCPS, L▮▮▮ is encouraged to contact his guidance counselor. This also can be accomplished beyond high school, through the Rehabilitation Services Administration – see below.

➢ **Volunteering:** An additional method to obtain hands-on experience is to volunteer. L▮▮▮ would not only gain a better understanding of the job or jobs involved, but volunteer experience is also helpful to list on resumes, college applications, scholarship applications, etc. During situational assessments and volunteer experiences, L▮▮▮ is encouraged to try out accommodations and supports when identified and available. It is important that L▮▮▮ understand his disability to the best of his ability and the compensatory strategies he can develop so that he can increase his knowledge base and ask for assistance when needed. This is especially important if he attends a post-secondary institution. He will need to take a copy of his high school IEP with him to prove his disability and request accommodations that might include:
- Tape recorder to tape class lectures
- Note taker
- Extended test time
- Extended time to turn in projects

➢ **Job Placement:** L▮▮▮'s strongest assets include, but are not limited to, his polite, pleasant and cooperative demeanor, good manual dexterity, whole body movement, and gross motor dexterity. It is recommended that the worksite L▮▮▮ is assigned be compatible with certain characteristics:
- Choose a job of high interest with frequent interaction with others who can assist and praise his performance.
- Learn the tasks by doing the tasks
- Multi-step directions that are short explanations with a demonstration
- Provide consistent reinforcement and encouragement
- Provide work within a team
- Provide consistent opportunities for Larry to work independently so that he can begin to rely on his own abilities and strengthen his self-esteem.
- Provide an organized workstation. Keep schedule and duties consistent. Minimize clutter, noise and other distractions. Arrange materials in order of use. Define work routine and divide complex work into sections.
- Provide both structure and supervision dealing with concern and interpersonal skills.
- L▮▮▮ will need a mentor to assist him through the interviewing process and review (with him) work expectations, rules and regulations both on and off the job.

4

Before L█████ graduates from school it is important that he receive career guidance or attend career classes. If not, then the following career skills need to be incorporated into his class lesson plans:

1. How to write personal information on an application
2. Complete a working resume that he can add to every six months
3. Investigate how to find and keep a job in the community
4. Pre-interview, interview, and post-interview skills through role playing and videoing
5. Visit different types of work environments and training programs including Community College (Prince George's Community College or Montgomery College, and/or University of the District of Columbia.

L███ appears to be more reactive to life situations. It is recommended that he participate in cognitive behavior therapy where emphasis might be on learning and developing decision-making strategies to be used when planning his career goals and life choices.

Larry's family will need to be familiar with adult service agencies. Rehabilitation Services Administration (202) 442-8469 can help with job placement and training once L███ leaves high school. L███ would be a good candidate for RSA's Work Adjustment program.

5

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## WASHINGTON, D.C.
## INDIVIDUALIZED EDUCATIONAL PROGRAM

### I. IDENTIFICATION INFORMATION

Student Name: Last _____ First: _____ MI: __
StudentID: _9001554_ Soc. Sec. No.: _5782180_ Age: _16_ Grade: _11_
Gender: _M_ Date of Birth: _____ Ethnic Group: _Black_
Address: _____
☐ Non-attending
Attending School: _Rock Creek Academy_ Home School: _Dunbar_
☐ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS
Parent: _Angela Braxton_
Address of: ☑ Parent ☐ Guardian ☐ Surrogate
Address: _____
Telephone: Home _____ Telephone: Work __

### II. CURRENT INFORM
Date of IEP Meeting: 9/26/2006
Date of Last IEP         6/17/2005
Date of Most Recent      6/2/2003
Meeting:
Eligibility Decision:
Purpose of IEP Conference:
☐ Initial IEP        ☑ Revi
☐ Requested Eval     ☑ 3yr F
Indicate Level of Standardized As
ADDENDA TO BE ATTACHED A
Check the appropriate box(es)
☐ BEHAVIOR          ☑ E
☑ TRANSPORTATION    ☐ T

| III. LANGUAGE | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements | To be completed by Office of Bilin Education English and Math Profi Assessment |
|---|---|---|---|---|---|
| Student | English | English | English | Native Language | Oral N/A |
| Parent | English | English | English | Native Language | Rdg./Written |
| Home | English | English | English | Native Language | Instrument Date |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd SpEd | Total | FREQUENCY Hr./Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | # |
|---|---|---|---|---|---|---|---|
| Specialized Instruction | ☐ ☑ | 25 | hr | W | Special Educator | 09/26/2006 | 11 |
| Psychological Counseling | ☐ ☑ | 2.1.5 hrs. | | W | Psychologist/Social Worker | 00/26/2006 | 11 |
| Substance Abuse Counseling | Total | 27.5 Hours Per Week | | Wk | Substance Abuse Counselor | 09/26/06 | 11 |

### V. DISABILITY(IES) Other Health Impairment
☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Serv
☐ 0-20% ☐ 21-60% ☑ 61-100%
Percent of time NOT in Regular Education Setting _100%_

### VI. IEP TEAM (Participants in the development of the IEP)
Print and sign your name below.

| | |
|---|---|
| Ms. Braxton, Parent | Angela Braxton    Angela Braxton |
| Larry Cooper, Student | Larry Cooper      Larry Cooper |
| Ms. Mills, Educational Advocate | _____    _____ |
| Ms. Johnson, Transition Specialist | Pamela Johnson    _____ |
| Mr. Clark, Homeroom Teacher | Chris Clark    C. Clark |
| Ms. Page, IEP Coordinator | Annette D. Page    _____ |
| Mrs. Bright, CAO | Samantha M. Bright    _____ |
| Mr. Smith, Substance Abuse Counselor | Anthony Smith, CH    _____ |
| Mrs. Gilliam, Clinical Therapist | Melanie Gilliam LGSW    M. Gilliam, LGSW |

☐ I AGREE with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of t consent to the implementation of the services in the IEP. I have received a copy of hte procedural safeguards and parent rights pertaining education.
Parent/Guardian Signature _____ Date _____

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINITATION
## SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in regular education?

◉ No

Explanation for removal out of regular education classroom.

Student's needs cannot be met in the general educational setting.

## X. SUPPLEMENTAL AIDS AND SERVICES

| CLASSROOM NEEDS (Do not name products or companies.) | SETTING | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNIN (mm/dd/ |
|---|---|---|---|---|---|---|---|
| | GenEd | SpEd | Total | Hr.Min | D/W/M | | |

Check and list modifications and/or accommodations for **testing**: ☐ None Needed

| | |
|---|---|
| Timing/Scheduling: | Extended time |
| Setting: | Small group setting |
| Presentation: | Repeated directions |
| Response: | Extra Response time |
| Equipment: | |

## XI. STATE AND DISTRICT ASSESSMENTS

☐ Level I — Tested with non-disabled peers under standard conditions without accommodations. (Describe non-uniform conditions for levelII)

☑ Level III — Tested under standard non-standard conditions with permissible accommodations.

☐ Level V — Portfolio:

☐ Level II — (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☐ Level IV — (Describe the alternative assessment)

## XII. AREAS REQUIRING SPECIALIZED INSTRUCTION AND RELATED SERVICES:

☑ Reading      ☐ Physical           ☐ Transition        ☐ Language Arts/Eng
☑ Mathmatics   ☑ Social Emotional   ☐ Vocational        ☐ Social Sciences
☑ Written Expression  ☐ Physical Development  ☐ Independent Living  ☐ Biological & Physical
☐ Other        ☐ Speech/Language   ☐ FineArts

☐ None    Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFEC |
|---|---|---|
| General Ed Setting | ○ Accept ○ Reject | Continued school failure |
| Combination setting | ○ Accept ○ Reject | Continued school failure |
| Out of general education | ◉ Accept ○ Reject | Impact on self-esteem |

Modifications(s)/Accommodation(s) to address the harmful effects:
Student's needs will be met in and out of the class environment
Location for Services: Rock Creek Academy

Date Developed: __9/26/2006__

## DCPS TRANSITION SERVICES PLAN

Note: The MDT determines if the IEP must include a statement of transition service needs which focuses on the Courses of study if the studen during the implementation of the IEP. Furthermore, the MDT must include a detailed transition plan for a student who will turn 16 during the imp of the IEP.

### I. Record student's post-secondary goals and interests.

| | |
|---|---|
| **Employment:** | Expressed interest in Law./NBA |
| **Community Participation:** | Completed at Beacon House Comm. Ministry |
| **Post-Secondary Education and Training:** | Wants to attend Temple Univ. |
| **Independent Living:** | Wants to live out of state. |

### II. Courses of study leading to student's post-high school goals

| Grade of School Year | Courses of Study |
|---|---|
| 2005/06 | Diploma Tract, 11th Grade |

### III. Transition Services Needed.

Evaluate the student's present level of performance in the following areas: Academic, Career Courses, Commu -based Training, Supported or Competitive Employment, Communicaiton, Independent Living Skills, Community Transportation, Employability Skills, Social Skills, Community Resources, Educational, Financial, Career Traini Community-Based Instruction, Skill/Trade Training, Vocational, or Social Relationships.

| Transition Services | Coordinated Activities and Strategies | Agency Responsi |
|---|---|---|
| **Employment**<br><br>If service is not needed provide explanation. | Student will participate in professional mentorship program. Student will research career areas of interest. | RCA |
| **Community Participation**<br><br>If service is not needed provide explanation. | Student will complete 100 hours of community service to graduate. Coordinate with guidance counselor. | RCA |
| **Post - Secondary Education and Training**<br><br>If service is not needed provide explanation. | Student will researcg schools that offer classes of interest. He will participate in college fairs. | RCA |
| **Independent Living**<br><br>If service is not needed provide explanation. | He will participate in transition classes at RCA. | RCA |
| **Daily Living Skills**<br><br>If service is not needed provide explanation. | Skills are age appropriate as of this update. | RCA |
| **Functional Vocational Evaluation**<br><br>If service is not needed provide explanation. | | |

| Other | | | |
|---|---|---|---|

| State Test Requirements | | Area | Date Taken | Score Received |
|---|---|---|---|---|

IV.

| Projected Exit Category (check one) | | High School Diploma Status | | Projected E> |
|---|---|---|---|---|
| ☑ DC High School Diploma | | 11.5 | # Credits Earned toward graduation | 6/15/2 |
| ☐ High School Certificate at age 21" | | | | |
| ☐ High School Certificate prior to age 21 | | | # Community Service Hours Completed | |

V. Identify any other agencies likely to be responsible for providing or paying for specific transition servic
   Examples of Agency Linkages Needed for Transition
   • Rehabilitation Services Administration (RSA)
   • Mental Retardation and Developmental Disabilities Administration (MRDDA)
   • Commission on Mental Health Services (CMES)
   • UDC or other higher education institutions

| Agency | Agency Representative | Telephone Number | Purpose of Contact |
|---|---|---|---|
| CPDC | Melissa Hensel | 202-832-0500 | Voc. Assessment |

# Exhibit 3

-26-2007 16:33 From:



Challenging Minds. Building Character.

Rock Creek Academy, Inc.
4401 Connecticut Ave., NW
Washington, DC 20008
202.378.1400

## PSYCHO-EDUCATIONAL EVALUATION

Name: Larry C.
DOB:
Age:    17 years, 0 month
DOE:   1/16 & 1/17/2007

School:    Rock Creek Academy
Grade:     11th
Examiner:  Nadjat S. Plowden, MS
DOR:       1/22/2007

### REASON FOR REFERRAL:

Larry C. is a 17-year-0-month-old, African American adolescent who was referred by his educational site for a psycho-educational evaluation. This psycho-educational evaluation will assess both his level of intellectual functioning and information processing abilities; while also measuring Larry's present level of academic functioning in reading, mathematics, written language, and oral language.

### EVALUATION METHODS:

Records Review
Wechsler Adult Intelligence Scale, Third Edition (WAIS-III)
Woodcock-Johnson III, Tests of Achievement (W-J III), Standard Battery

### RELEVANT BACKGROUND INFORMATION:

Larry C. is a 17-year-old African American adolescent who is a student at Rock Creek Academy. He is receiving services at that location with the primary disability classification of Other Health Impaired. His most recent IEP (9/06) stipulated that Larry was to receive the following services each week, with times in parentheses: Specialized Instruction (25 hours), Psychological Counseling (1.5 hours), and Substance Abuse Counseling (1 hour).

### BEHAVIORAL OBSERVATIONS:

Larry was evaluated in a relatively quiet room with few distractions Rock Creek Academy. He entered the evaluation session with remarkable reservation going so far as to say that his mother had to speak to him in order to coerce him to participate. However, it should be noted that he required few to no prompts during the session. Larry appeared relaxed and calm during the session. During several subtests such as Vocabulary, Comprehension, and Similarities Larry, when queried, would supply brief one to two word responses or state, "I don't know that." This pattern was evident throughout the session. However, Larry showed enhanced effort when he knew he was under a time limit.

Throughout the evaluation session Larry's voice quality and level were consistent and was easy to comprehend. He spontaneously kept eye contact when his name was called or the evaluator paused. He is right handed, uses an adapted pencil grip, and uses his left hand well in coordination with his right. The present evaluation data should be considered a valid and reliable measure of his true abilities.

## TEST RESULTS AND INTERPRETATION:

### Cognitive Abilities:

**WAIS General Intellectual Ability**

Larry was administered 11 subtests of the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) from which his IQ and Index scores were derived. The Full Scale IQ is the aggregate of the Verbal and Performance scores and is usually considered to be the most representative measure of g, or global intellectual functioning. Larry's general cognitive ability is in the Low Average range of intellectual functioning, as measured by the Wechsler Adult Intelligence Scale -Third Edition (WAIS-III). His overall thinking and reasoning abilities exceed those of approximately 10% of adults his age (FSIQ = 81; 95% Confidence Interval = 77-85).

### Verbal and Performance Abilities:

The Verbal score is a measure of acquired knowledge, verbal reasoning, and comprehension of verbal information. His verbal reasoning abilities, as measured by the Verbal IQ, are in the Low Average range and above those of approximately 13.0% of his peers (VIQ = 83, 95% Confidence Interval = 79-88). On the verbal reasoning subtests, Larry obtained his highest score(s) on the Comprehension subtest(s) and his lowest score(s) on the Similarities and Information subtest(s). His performance on these subtests differs significantly relative to each other and suggests that these are the areas of most pronounced strength and weakness, respectively, in Larry's profile of verbal reasoning abilities.His weak performance on the Similarities and Information subtest(s) is below that of most of his peers. The Verbal Comprehension Index (VCI) is similar to the Verbal IQ in that it provides a measure of verbal acquired knowledge and verbal reasoning. However, it does not include the measures of abilities related to working memory, such as holding information to perform a specific task. Therefore, the Verbal Comprehension Index may be considered a purer measure of verbal comprehension than is the Verbal IQ. In Larry's case, his Verbal Comprehension Index score is generally comparable to his Verbal IQ score. On the Verbal Comprehension Index, Larry's performance is somewhat less well developed than that of his peers. His ability to understand and respond to verbally presented material is better than that of only 9.0% of others his age (VCI = 80, 95% Confidence Interval = 75-86).

The Performance score provides an indication of an individual's nonverbal reasoning, spatial processing skills, attentiveness to detail and visual-motor integration. His nonverbal reasoning abilities, as measured by the Performance IQ, are in the Low Average range and better than those of approximately 13.0% of his peers (PIQ = 83, 95% Confidence Interval = 77-91). On the nonverbal reasoning subtests, Larry obtained his lowest score(s) on the Matrix Reasoning subtest(s). His performance differs significantly from his Nonverbal subtest mean score and suggests that this is the area of most pronounced weakness in Larry's profile of nonverbal reasoning abilities.The Perceptual Organization Index (POI) is actually a purer measure of nonverbal reasoning than is the Performance IQ. The POI measures fluid reasoning, spatial processing, attentiveness to detail, and visual motor integration. However, it does not measure the individual's speed in processing information or

performing simple tasks related to that information.   In Larry's case, his Perceptual Organization Index score is comparable to his Performance IQ score. Larry's nonverbal reasoning abilities are less developed than those of his peers. His performance on the Perceptual Organization Index exceeds that of only 7.0% of his age-mates (POI = 78, 95% Confidence Interval = 72-87).

His ability to think with words is comparable to his ability to reason without the use of words.  Both Larry's verbal reasoning and nonverbal reasoning abilities are also in the Low Average range.

**IQ Scores Summary**

| Scale | Sum of SS | IQ Score | 95% Conf. Interval | PR | Qualitative Description |
|---|---|---|---|---|---|
| Verbal | 43 | 83 | 79-88 | 13.0 | Low Average |
| Performance | 38 | 83 | 77-91 | 13.0 | Low Average |
| Full Scale | 80 | 81 | 77-85 | 10.0 | Low Average |

Difference between VIQ and PIQ = 0(ns, Freq= 100%).

**Subtest Scores Summary**

| Verbal Subtests | Raw Score | Age SS | PR | Reference SS* |
|---|---|---|---|---|
| Vocabulary | 23 | 7 | 16 | 6 |
| Similarities | 13 | 6 | 9 | 5 |
| Arithmetic | 10 | 8 | 25 | 8 |
| Digit Span | 13 | 7 | 16 | 7 |
| Information | 7 | 6 | 9 | 6 |
| Comprehension | 16 | 9 | 37 | 8 |
| Letter-Number Sequencing | | | | |

**Subtest Scores Summary**

| Performance Subtests | Raw Score | Age SS | PR | Reference SS* |
|---|---|---|---|---|
| Picture Completion | 20 | 9 | 37 | 9 |
| Digit Symbol-Coding | 69 | 8 | 25 | 8 |
| Block Design | 24 | 6 | 9 | 6 |
| Matrix Reasoning | 8 | 4 | 2 | 5 |
| Picture Arrangement | 16 | 10 | 50 | 10 |
| Symbol Search | | | | |
| Object Assembly | | | | |

*Reference Group for ages 20-34

**Summary of WAIS-III Intellectual Abilities**

On the basis of his WAIS-III performance, Larry's verbal comprehension skills and his nonverbal reasoning abilities are comparable. Larry is a 17 year old male who completed the WAIS-III. His overall cognitive ability, as estimated by the Full Scale IQ, is in the Low Average range (FSIQ=81). On the Verbal scale, his score is in the Low Average range (VIQ = 83). Larry's Performance score is in the Low Average range (PIQ = 83). On the Perceptual Organization Index, he performed in the Borderline range (POI = 78). Larry performed in the Low Average range on the Verbal Comprehension Index (VCI = 80).

<u>Academic Achievement:</u>

Larry was also administered the **Woodcock-Johnson Tests of Achievement, Third Edition, Form A (W-J III)** measuring four academic areas: Reading, Oral Language, Math, and Written Language. Performances on the 13 individual tests within this battery combine to produce 10 cluster scores that indicate Larry's achievement in certain academic areas. A handwriting test gives an independent handwriting assessment, which is not considered in any of the cluster scores. The mean score for this battery is 100, with a standard deviation of +/- 15. The scores can be interpreted using the following categories:

| | |
|---|---|
| 131 and above | Very Superior Range |
| 121-130 | Superior Range |
| 111-120 | High Average Range |
| 90-110 | Average Range |
| 80-89 | Low Average Range |
| 70-79 | Low Range |
| 69 and Below | Very Low Range |

The W-J III battery covers a wide range of academic skills and can be useful in academic planning. Scores, however, should be interpreted with caution since the norm sample used was weighted to match the US census, which does not match the demographic population of Washington, D.C.

Summaries of all scores and graphs to assist in interpreting the scores are attached to this report. Larry's performance on the W-J III is discussed below.

**READING**

To assess his current level of functioning in the area of reading, Larry was administered the Letter-Word Identification, Reading Fluency, and Passage Comprehension tests of the W-J III. Performance on these tests yields one cluster score, **Broad Reading**, which is described below.

The **Broad Reading** cluster provides a comprehensive measure of reading achievement including reading decoding, reading speed, and ability to comprehend connected discourse while reading. This cluster is a combination of the **Letter-Word Identification, Reading Fluency, and Passage Comprehension** tests. Larry earned a **Broad Reading** cluster Standard Score of 86 (18th %ile, AE 12-6), which was in the Low Average range and ranked at the 7.1 grade level. The various tests that made up this cluster are described below.

JHN-25-200 Case 1:07-cv-00632-CKK    Document 9-4    Filed 09/14/2007    Page 5 of 14

The **Letter-Word Identification** test measures the subject's word identification skills. The initial items require the individual to decode words correctly. The individual is not required to know the meaning of any word. The items become increasingly difficult as the selected words appear less and less frequently in written English. L___ has developed average skills with decoding using phonics. In addition, he seems to have a close approximation to the expected sight vocabulary for a student his age. On this test L___ received a Standard Score of 91 (27th %ile, AE 13-6), which was in the Average range and ranked at the 8.0 grade level.

The **Reading Fluency** test measures the person's ability to quickly read simple sentences in the Subject Response Booklet, decide if the statement is true, and circle "yes" or "no". The difficulty range of these sentences gradually increases to a moderate level. The individual tries to complete as many items as possible in a three-minute time limit. L___ was able to complete 63 items with 7 errors. L___ received a Standard Score of 88 (21st %ile, AE 13-2), which was in the Low Average range and ranked at the 7.9 grade level.

The items presented to L___ on the **Passage Comprehension** test required him to read a short passage and identify a missing key word that made sense in the context of that passage. The items became increasingly difficult by removing pictorial stimuli and by increasing passage length, level of vocabulary, and complexity of syntactic and semantic cues. L___ had remarkable difficulty with the **Passage Comprehension** items. Interestingly, while he again showed average use of the phonics skills that were evident in the **Letter-Word Identification** test responses, his comprehension skills were poorly developed and he was consistently unable to use context cues and seemed to have little to no practice completing similar types of reading tasks. L___ received a Standard Score of 76 (5th %ile, AE 9-4), which was in the low range and ranked at the 4.0 grade level.

## ORAL LANGUAGE

To assess his abilities to understand and use information presented orally, L___ was administered the **Story Recall**, **Story Recall-Delayed**, and **Understanding Directions** tests of the W-J III. Performance on these tests is described below. Analysis of these three tests yields one cluster score, Oral Language.

The Oral Language Cluster score is an aggregate measure of linguistic competency, listening ability, and comprehension. L___ earned an **Oral Language** Cluster Standard Score of 90 (26th %ile, AE 12-7), which was in the Average range and ranked at the 7.6 grade level.

The **Story Recall** and **Story Recall-Delayed** tests measure aspects of oral language including language development and meaningful memory. The task requires the student to recall increasingly complex stories that are presented orally. After listening to a passage, the individual is asked to recall as many details of the story as can be remembered. The delay task is similar, but given at least one hour later. L___ performed below average on the **Story Recall** tasks. He remembered the beginnings equally well as the middle and end parts and inconsistently remembered the most salient or bold-faced words repeatedly. He performed in a similar manner on the **Story Recall-Delayed** as he had on the immediate recall tasks. He received a **Story Recall** Standard Score of 88 (22nd %ile, AE 10-5), which was in the Low Average range and ranked at the 5.0 grade level.

The **Understanding Directions** test is an oral language measure. The task requires the student to listen to audio-recorded instructions and then follow directions by pointing to various objects in a colored picture. The items gradually increase in linguistic complexity as the number of tasks to perform increases. L___'s responses to the **Understanding Directions** test were relatively consistent in that he answered the easier ones correctly as

well as the more difficult ones. As the tasks became more difficult he exhibited strengths by accurately identifying the items asked to be pointed out. He showed inconsistent comprehension of directions which included cues such as, "If...then..." as well as "Either choose...or..." His test Standard Score was 92 (30th %ile, AE 13-8), which was in the Average range and ranked at the 8.0 grade level.

## MATHEMATICS

To assess his current level of functioning in the area of mathematics, ____ was administered the **Calculation**, **Applied Problems**, and **Math Fluency** tests of the W-J III. Performance on these tests yields two cluster scores, Broad Math and Math Calculation Skills, which are described below.

The **Broad Math** cluster provides a comprehensive measure of math achievement including the ability to perform mathematical computations, the ability to solve simple addition, subtraction, and multiplication facts quickly, and the ability to analyze and solve math problems. ____ earned a **Broad Math** cluster Standard Score of 81 (11th %ile, AE 12-0), which was within the Low Average range and ranked at the 6.5 grade level. The various tests that make up this cluster are discussed below.

The **Calculation** test measures the subject's ability to perform mathematical computations. The initial items in the Calculation test require the subject to perform addition, subtraction, multiplication, and division with whole numbers, fractions, percents, and negative numbers. ____ had below average skills in basic math operations. He has evidently memorized several of the addition, subtraction, division, and multiplication basic math facts. On several of the problems he was able to perform the processes such as borrowing, carrying, and simple addition for more than two numbers. He was not able to complete any long division problems or problems involving fractions when least common denominator or reduction of fractions was involved, percents, negative numbers, or any algebraic solutions. His **Calculation** test Standard Score was 80 (9th %ile, AE 11-9), which was in the Low Average range and ranked at the 6.2 grade level.

The **Math Fluency** test presents a number of one-digit addition, subtraction, and multiplication problems. The student is to solve as many as possible in three minutes. On the math fluency tasks ____ showed below average ability with completing his basic math facts quickly. He completed 89 problems with four errors. ____'s **Math Fluency** test Standard Score was 83 (14th %ile, AE 12-6), which was in the Low Average range and ranked at the 7.1 grade level.

The **Applied Problems** test requires the student to analyze and solve math problems. To solve the problems the person must listen to the problem, recognize the procedure to be followed, and then perform relatively simple calculations. Because many of the problems contain extraneous information, the individual must decide not only the appropriate mathematical operation to use, but also which numbers to include in the calculation. Item difficulty increases with complex calculations. ____'s performance on the **Applied Problems** tasks indicated that he has had *some* of the basic life experiences that would be expected of a boy his age. He was able to solve some problems involving money and telling time. His **Applied Problems** test Standard Score was 86 (18th %ile, AE 11-11), which was in the Low Average range and ranked at the 6.4 grade level.

The **Math Calculation Skills Cluster** is an aggregate measure of computational skills and automaticity with basic math facts and provides a measure of basic math skills. Calculation and Math Fluency tests comprise this cluster, ____ received a cluster Standard Score of 80 (10th %ile, AE 12-1), which was in the Low Average range and ranked at the 6.5 grade level.

## WRITTEN LANGUAGE

To measure L████'s achievement in written language, he was administered the Spelling, Writing Fluency, and Writing Samples tests of the W-J III, which produce two language cluster scores, **Broad Written Language** and **Written Expression**. These tests and cluster scores are discussed below.

The **Broad Written Language** cluster provides a comprehensive measure of written language achievement including spelling of single word responses, fluency of production, and quality of expression. Spelling, Writing Fluency, and **Writing Samples** tests comprise this cluster. ████ received a **Broad Written Language** cluster Standard Score of 94 (36th %ile, AE 14-10), which was in the Average range and ranked at the 9.1 grade level.

The **Spelling** test measures the ability to write orally presented words correctly. The items become increasingly difficult as the words contain more syllables and spelling irregularities. L████ seems to rely on memory and an average grasp of phonetics to spell the words that he was able to answer correctly. He received a Spelling test Standard Score of 93 (31st %ile, AE 14-7), which was in the Average range and ranked at the 8.3 grade level.

The **Writing Fluency** test measures skills in formulating and writing simple sentences quickly. Each sentence must relate to a given stimulus picture in the Subject Response Booklet and includes a given set of three words. This test has a seven-minute time limit. L████ received a Standard Score of 103 (59th %ile, AE >20), which was in the Average range and ranked at the 12.9 grade level.

The **Writing Samples** test measures skill in writing responses to a variety of demands. The person must produce written sentences that are evaluated with respect to the quality of expression. Item difficulty increases by increasing the passage length, level of vocabulary, grammatical complexities, and level of concept abstraction. The individual is not penalized for errors in basic writing skills such as spelling, capitalization, or punctuation. L████ performed below average on the **Writing Samples** tasks. On the **Writing Samples** test he received a Standard Score of 78 (7th %ile, AE 10-3), which was in the Low range and ranked at the 4.8 grade level.

The **Written Expression** cluster is an aggregate measure of meaningful written expression and fluency providing a measure of written expression skills. This cluster is a combination of the **Writing Fluency** and **Writing Samples** tests. His **Written Expression** cluster Standard Score was 96 (40th %ile, AE 15-1), which was in the Average range and ranked at the 9.7 grade level.

## SPECIAL PURPOSE CLUSTERS

Various combinations of tests in the W-J III Standard Battery are used together to form four additional cluster scores: **Academic Skills, Academic Fluency, Academic Applications,** and **Total Achievement.** The skills and applications clusters test reading, math, and written language, and can be used to determine whether the person exhibits significant strengths, weaknesses, or both among these types of tasks and across academic areas.

The Academic Skills Cluster is an aggregate measure of reading decoding, math calculation, and spelling of single-word responses, providing an overall score of basic achievement skills. It is a combination of the Letter-Word Identification, Calculation, and Spelling tests. Each of these tests was discussed previously. Lang's Academic Skills cluster Standard Score was 87 (19th %ile, AE 13-2), which was in the Low Average range and ranked at the 7.4 grade level.

The Academic Fluency Cluster is a combination of Reading Fluency, Math Fluency, and Writing Fluency that provides an overall index of academic fluency or speed with which the student can read, perform simple math problems, and perform simple writing tasks. Lang's Academic Fluency cluster Standard Score was 90 (24th %ile, AE 13-1), which was in the Average range and ranked at the 8.6 grade level.

The Academic Applications cluster is composed of the Passage Comprehension, Applied Problems, and Writing Samples test. These three tests require the application of academic skills to academic problems and are discussed above. Tasks for this cluster score were completed without time limits. Lang's Academic Applications Score was 78 (7th %ile, AE 10-10), which was in the Low range and ranked at the 5.3 grade level.

The Total Achievement Cluster is a combination of the nine tests included in the Broad Reading, Broad Math, and Broad Written Language cluster scores and can be viewed as representing a person's overall performance across the various achievement domains. The major reason for the Low Average achievement score attained by Lang is his cumulative low average abilities with mathematics, written language, and reading. Lang's Total Academic Achievement Standard Cluster score was 84 (14th %ile, AE 12-10), which was in the Low Average range and at the 7.3 grade level.

| Cluster | Raw | AE | Easy to Diff | | RPI | PR | SS(68% Band) | GE |
|---|---|---|---|---|---|---|---|---|
| ORAL LANGUAGE | -- | 12-7 | 8-6 | >21 | 83/90 | 26 | 90 (85-95) | 7.6 |
| TOTAL ACHIEVEMENT | -- | 12-10 | 11-1 | 14-11 | 51/90 | 14 | 84 (82-85) | 7.3 |
| BROAD READING | -- | 12-6 | 11-2 | 14-0 | 32/90 | 16 | 86 (85-80) | 7.1 |
| BROAD MATH | -- | 13-0 | 10-6 | 16-0 | 54/90 | 11 | 81 (79-84) | 6.5 |
| BROAD WRITTEN LANG | -- | 14-10 | 11-11 | 19 | 85/90 | 36 | 94 (92-97) | 9.1 |
| MATH CALC SKILLS | -- | 12-1 | 10-3 | 14-6 | 51/90 | 10 | 80 (77-84) | 6.5 |
| WRITTEN EXPRESSION | -- | 15-1 | 11-11 | >21 | 86/90 | 40 | 96 (93-100) | 9.7 |
| ACADEMIC SKILLS | -- | 13-2 | 11-5 | 15-4 | 61/90 | 19 | 87 (84-89) | 7.4 |
| ACADEMIC FLUENCY | -- | 13-11 | 12-4 | 15-8 | 63/90 | 24 | 90 (88-91) | 8.6 |
| ACADEMIC APPS | -- | 10-10 | 9-3 | 13-1 | 50/90 | 7 | 78 (75-81) | 5.3 |

Form A of the following achievement tests was administered:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Letter-Word Identification | 62 | 13-6 | 12-2 | 15-4 | 59/90 | 27 | 91 (88-94) | 8.0 |
| Reading Fluency | 57 | 13-2 | 12-3 | 14-1 | 16/90 | 21 | 88 (86-89) | 7.9 |
| Story Recall | -- | 10-5 | 6-1 | >21 | 84/90 | 22 | 88 (80-97) | 5.0 |
| Understanding Directions | -- | 13-0 | 9-10 | 16-11 | 81/90 | 30 | 92 (87-97) | 9.0 |
| Calculation | 21 | 11-9 | 10-5 | 13-9 | 44/90 | 9 | 80 (75-85) | 6.2 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Math Fluency | 85 | 12-6 | 10-0 | 16-2 | 7 | /90 | 14 | 83 (81-86) | 7.1 |
| Spelling | 41 | 14-7 | 11-11 | 17-0 | 7 | /90 | 31 | 93 (89-96) | 8.3 |
| Writing Fluency | 27 | >20 | 14-6 | >20 | 9 | /90 | 59 | 103 (90-108) | >12.9 |
| Passage Comprehension | 29 | 9-4 | 8-4 | 11-2 | 3 | /90 | 5 | 76 (71-81) | 4.0 |
| Applied Problems | 39 | 11-11 | 10-10 | 13-4 | 3 | /90 | 18 | 86 (84-89) | 6.4 |
| Writing Samples | 10-0 | 10-3 | 8-0 | 17-1 | 75 | /90 | 7 | 78 (69-87) | 4.8 |
| Story Recall--Delayed | – | – | – | – | | | – | – | – |

## SUMMARY:

Larry C_____ is a 17-year-old African American adolescent who is a student at Rock Creek Academy. He is receiving services at that location with the primary disability classification of Other Health Impaired. His most recent IEP (9/06) stipulated that Larry was to receive the following services each week, with times in parentheses: Specialized Instruction (25 hours), Psychological Counseling (1.5 hours), and Substance Abuse Counseling (1 hour).

On the basis of his WAIS-III performance, Larry's verbal comprehension skills and his nonverbal reasoning abilities are comparable. Larry is a 17 year old male who completed the WAIS-III. His overall cognitive ability, as estimated by the Full Scale IQ, is in the Low Average range (FSIQ=81).On the Verbal scale, his score is in the Low Average range (VIQ = 83). Larry's Performance score is in the Low Average range (PIQ = 83).On the Perceptual Organization Index, he performed in the Borderline range (POI = 78). Larry performed in the Low Average range on the Verbal Comprehension Index (VCI = 80). His verbal reasoning abilities, as measured by the Verbal IQ, are in the Low Average range and above those of approximately 13.0% of his peers (VIQ = 83, 95% Confidence Interval = 79-88). On the verbal reasoning subtests, Larry obtained his highest score(s) on the Comprehension subtest(s) and his lowest score(s) on the Similarities and Information subtest(s). His performance on these subtests differs significantly relative to each other and suggests that these are the areas of most pronounced strength and weakness, respectively, in Larry's profile of verbal reasoning abilities.His weak performance on the Similarities and Information subtest(s) is below that of most of his peers. The Verbal Comprehension Index (VCI) is similar to the Verbal IQ in that it provides a measure of verbal acquired knowledge and verbal reasoning. However, it does not include the measures of abilities related to working memory, such as holding information to perform a specific task. Therefore, the Verbal Comprehension Index may be considered a purer measure of verbal comprehension than is the Verbal IQ. In Larry's case, his Verbal Comprehension Index score is generally comparable to his Verbal IQ score. On the Verbal Comprehension Index, Larry's performance is somewhat less well developed than that of his peers. His ability to understand and respond to verbally presented material is better than that of only 9.0% of others his age (VCI = 80, 95% Confidence Interval = 75-86). The Performance score provides an indication of an individual's nonverbal reasoning, spatial processing skills, attentiveness to detail and visual-motor integration. His nonverbal reasoning abilities, as measured by the Performance IQ, are in the Low Average range and better than those of approximately 13.0% of his peers (PIQ = 83, 95% Confidence Interval = 77-91). On the nonverbal reasoning subtests, Larry obtained his lowest score(s) on the Matrix Reasoning subtest(s). His performance differs significantly from his Nonverbal subtest mean score and suggests that this is the area of most pronounced weakness in Larry's profile of nonverbal reasoning abilities.The Perceptual Organization Index (POI) is actually a purer measure of nonverbal reasoning than is the Performance IQ. The POI measures fluid reasoning, spatial processing, attentiveness to detail, and visual motor integration. However, it does not measure the individual's speed in processing information or performing simple tasks related to that information.

In L████'s case, his Perceptual Organization Index score is comparable to his Performance IQ score. L████'s nonverbal reasoning abilities are less developed than those of his peers. His performance on the Perceptual Organization Index exceeds that of only 7.0% of his age-mates (POI = 78, 95% Confidence Interval = 72-87).

L████ was administered a set of tests from the W-J III Tests of Achievement. Direct comparisons can be made among L████'s achievement scores. These comparisons help determine the presence and significance of any strengths and weaknesses among his abilities. L████'s oral language skills are average when compared to the range of scores obtained by others at his age level. When compared to others at his age level, L████'s academic skills and his fluency with academic tasks are both within the low average range. His ability to apply those skills falls within the low range. L████'s performance is average in written language and written expression; and low average in reading, mathematics, and math calculation skills. No discrepancies were found among L████'s achievement areas.

All of this information about his academic, cognitive, and processing strengths and weaknesses has significant implications for his subsequent academic and pre-vocational planning.

## RECOMMENDATIONS:

Based on these findings the following recommendations are made:

1. L████'s school should convene a Multi-Disciplinary Team to consider the test results and other current evaluations and recommend a special education program that is appropriate to meet his emotional, academic, and information processing needs.

2. Due to commensurate achievement and ability levels L████ will not qualify as a student with a specific learning disability. However, due to his classification as Other Health Impaired he still qualifies as a student in need of special education services. He will require a highly individualized program in a special school for adolescents with special needs. This program must be provided in a school placement that has on-site services for therapeutic intervention on an individual and group basis, which can be provided regularly in coordination with the academic program.

3. L████ should have available to him the latest technology in order to support him in his special education program. He should have available to him a computer, calculator, tape-recorder and books-on-tape.

4. L████'s teachers should seek to expand on his remarkable writing skills as means through which to facilitate overall growth, i.e. using a written assignment as a warm up for more difficult assignments such as math and/or reading.

5. L████ will require a curriculum rich with real world type math assignments, significant remedial skills training in reading, utilizing books on tape and other aides to assist his significant weaknesses in written language and reading.

6. L████ must be enrolled in an academic setting wherein he may have a low pupil to teacher ratio in order to find further academic success.

Formal or informal reevaluation should be conducted within one year to assess [name]'s progress on the goals and objectives set to better address his educational needs.

Evaluator: Nadjai S. Plowden, MS, GWU Doctoral Psychology Intern

Supervisor: Martha Ross Ozer, Ed.D, Psychologist
DC Psychology License # PSY 1000168

# Exhibit 4



Challenging Minds. Building Character.

Rock Creek Academy, Inc
4401 Connecticut Ave., NW
Washington, DC 20008
202.378.1400

## PSYCHOLOGICAL EVALUATION REPORT
## DRAFT

**Name:** Larry Cooper                    **School:**    Rock Creek Academy
**DOB:** 1/12/1990                        **Grade:**     12
**Age:**  17 years, 0 months              **Examiner:**  Nadjai Plowden, MS, Doctorial Psychology Intern
**DOE:** 2/15/2007                        **DOR:**       2/20/2007 *Submitted 9/24/07*

### REASON FOR REFERRAL

Larry Cooper, a 17-year old, African American student was referred for a clinical psychological evaluation. This clinical evaluation will describe Larry's social, behavioral, and emotional functioning in order to develop his special education program.

### EVALUATION METHODS:

Records Review
Behavior Assessment Scales for Children, Second Edition (BASC-2), Parent Rating Scales-Child
Behavior Assessment Scales for Children, Second Edition (BASC-2), Teacher Rating Scales-Child
Behavior Assessment Scales for Children, Second Edition (BASC-2), Self Report-Child
Bender Visual Motor Gestalt Test (emotional indicators)
Draw-A-Person Test
Rorschach Inkblot Technique, attempted
Clinical Interview
Observations

### RELEVANT BACKGROUND INFORMATION:

Larry Cooper is a 17-year-old African American adolescent who is a student at Rock Creek Academy. He is receiving services at that location with the primary disability classification of Other Health Impaired. His most recent IEP (9/06) stipulated that Larry was to receive the following services each week, with times in parentheses: Specialized Instruction (25 hours), Psychological Counseling (1.5 hours), and Substance Abuse Counseling (1 hour).

This evaluator completed a psycho-educational battery of Larry in January of 2007. On the basis of his WAIS-III performance, Larry's verbal comprehension skills and his nonverbal reasoning abilities are comparable. Larry is a 17 year old male who completed the WAIS-III. His overall cognitive ability, as estimated by the Full Scale IQ, is in the Low Average range (FSIQ=81). On the Verbal scale, his score is in the Low Average range (VIQ = 83). Larry's Performance score is in the Low Average range (PIQ = 83). On the Perceptual Organization

Index, he performed in the Borderline range (POI = 78).Larry performed in the Low Average range on the Verbal Comprehension Index (VCI = 80). His verbal reasoning abilities, as measured by the Verbal IQ, are in the Low Average range and above those of approximately 13.0% of his peers (VIQ = 83, 95% Confidence Interval = 79-88).

Larry was also administered a set of tests from the W-J III Tests of Achievement. Direct comparisons can be made among Larry's achievement scores. These comparisons help determine the presence and significance of any strengths and weaknesses among his abilities. Larry's oral language skills are average when compared to the range of scores obtained by others at his age level. When compared to others at his age level, Larry's academic skills and his fluency with academic tasks are both within the low average range. His ability to apply those skills falls within the low range. Larry's performance is average in written language and written expression; and low average in reading, mathematics, and math calculation skills. No discrepancies were found among Larry's achievement areas.

While Larry's file contained no previous clinical evaluations – some of his therapists at High Roads did provide clinical updates pertaining to his emotional progress. Larry apparently was receiving group and individual therapy to address his impulsivity, anger management, and interpersonal skills. He also showed markedly divergent personality traits. He was viewed as being capable of earning the top behavioral levels but at other times was also capable of being defiant, disruptive, and disrespectful. It was noted that the poor behavior was often done when interacting with peers as it was written, "…he often appears to instigate negativity or disruptive behavior with peers." Over the course of his time at High Roads and his concurrent therapy he was able to master several goals including but not limited to; following directions the first time given; working on not arguing; making good choices and not being disrespectful to staff members.

It is of note to this evaluator that no other psychological or medical data was on file that addressed the basis of his designation of Other Health Impaired. As a result it is unknown at the time of this report the extent to which this disability still currently exists and or impacts Larry's academic and social emotional functioning. Previous records from High Roads also indicate that no data was on file and that that his diagnosis was unknown.

This clinical psychological evaluation will assist Larry's teachers to develop his curriculum in light of his present social, emotional and behavioral functioning.

**BEHAVIORAL OBSERVATIONS:**

Larry was evaluated at Rock Creek Academy in a quiet room with no outside distractions. He presented as a slightly oppositional and disinterested youth who was well dressed and showed notable apprehension on leaving his classroom and separating from his teacher stating, "Why do I have to do this stuff again?!"

During this session, he rarely smiled and seemed disinterested. Larry appeared bored as reflected by his frequent sighing. He initiated no spontaneous conversation yet maintained adequate eye contact. He also clearly understood the task at hand and needed no prompts to stay on task or complete the items. It is of particular note that Larry was reluctant to respond to the Rorschach cards and thus did not give enough responses to score the test. As a result this evaluation provides minimal information regarding Larry's social emotional functioning and should be interpreted with caution.

**TEST RESULTS AND INTERPRETATION:**

2

## Objective Personality Data

Behavior rating scales completed by his teacher and himself, and were used to screen for problems in Larry's social/emotional/ behavioral functioning.  Rating scales sent to his home were not returned.

Mr. Thomas Clark, Larry's special education teacher completed the BASC-2 (Behavior Assessment System for Children, Second Edition) Teacher Rating Scale for Children Age 12-21. This checklist contains 139 questions that can be viewed in a clinical profile that indicates levels of hyperactivity, aggression, conduct problems, externalizing problems, anxiety, depression, somatization, internalizing problems, atypicality, withdrawal, attentional problems, learning problems, social skills, adaptability, functional communication, and leadership.

According to Mr. Clark Larry's Externalizing Problems composite-scale T score is 61, with a 90 percent confidence-interval range of 58-64 and a percentile rank of 88. Larry's T score on this composite scale falls in the At-Risk classification range.  Larry's T score on Hyperactivity is 62 and has a percentile rank of 88. This T score falls in the At-Risk classification range.  Mr. Clark feels that Larry often engages in a number of behaviors that may be adversely affecting other children in the classroom. At times, Larry is considered to be restless and impulsive, and has difficulty maintaining his self-control.  Larry's T score on Conduct Problems is 68 and has a percentile rank of 93. This T score falls in the At-Risk classification range.  His teacher feels that Larry sometimes engages in rule-breaking behavior, such as cheating, deception, and/or stealing.  Mr. Clark also identified that Larry sometimes has difficulty controlling and maintaining his behavior and mood.  Mr. Clark also noted that Larry, does not tend to act in a threatening or intrusive manner; has social and communication skills that are typical of others his age; able to control his reactions to environmental changes about as well as others his age; reacts to changes in everyday activities or routines in a manner that is typical of others his age; and is able to overcome stress and adversity about as well as do others his age.  Some of the critical items identified by Mr. Clark include but are not limited to: Is easily annoyed by others – *Sometimes*; Smokes or chews tobacco at school - *Sometimes*; and hits other adolescents – *Sometimes*.

Larry completed a Behavior Assessment System for Children Self Report. Larry seemed to respond in a pattern that denied most problems.  He reported that enjoys school about as much as others his age; engages in risky behaviors as often as others his age; reports having unusual thoughts and perceptions no more than others his age; reports having control over his life at a level that is typical for persons his age; reports anxiety-based feelings no more often than others his age; reports depressed feelings no more often than others his age; and reports feelings of inadequacy slightly less often than others his age.   The only Critical Item identified of note was: I feel like my life is getting worse and worse - *Sometimes*.

## Projective Personality Data

Drawings and the Rorschach Ink Blot Technique were used to evaluate Larry's emotional functioning.

Larry's drawings were well below his grade and age level.  However, he made it clear that he had no interest in drawing or cooperating with the projective components of testing.  His Bender drawings contained indications of problems with insecurity and anxiety.  His human figure drawing consisted of stick figures as he quipped, "I can't draw no way so why should I do it any better?"  However the limited content suggested problems with aggression and a lack of control.

3

The Rorschach Inkblot Technique was administered to Larry in order to generate hypotheses about personality characteristics associated with his psychological functioning. However, Larry refused to give enough responses so that the Exner scoring system could be utilized. As a result a thorough synopsis pertaining to his personality could not be ascertained. The responses he did give were often the popular responses found when an individual is attempting to be overly conventional. Despite numerous attempts to cajole Larry into giving added responses he often stated, "I don't see nothing else. You can't make me see something if I don't see it!" Several attempts were made following the initial administration of this clinical battery to garner more responses, however, Larry refused to cooperate with said attempts.

**SUMMARY:**
Larry Cooper is a 17-year-old African American adolescent who is a student at Rock Creek Academy. He is receiving services at that location with the primary disability classification of Other Health Impaired. His most recent IEP (9/06) stipulated that Larry was to receive the following services each week, with times in parentheses: Specialized Instruction (25 hours), Psychological Counseling (1.5 hours), and Substance Abuse Counseling (1 hour).

This evaluator completed a psycho-educational battery of Larry in January of 2007. On the basis of his WAIS-III performance, Larry's verbal comprehension skills and his nonverbal reasoning abilities are comparable. Larry is a 17 year old male who completed the WAIS-III. His overall cognitive ability, as estimated by the Full Scale IQ, is in the Low Average range (FSIQ=81).On the Verbal scale, his score is in the Low Average range (VIQ = 83). Larry's Performance score is in the Low Average range (PIQ = 83).On the Perceptual Organization Index, he performed in the Borderline range (POI = 78).Larry performed in the Low Average range on the Verbal Comprehension Index (VCI = 80). His verbal reasoning abilities, as measured by the Verbal IQ, are in the Low Average range and above those of approximately 13.0% of his peers (VIQ = 83, 95% Confidence Interval = 79-88).

Larry was also administered a set of tests from the W-J III Tests of Achievement. Direct comparisons can be made among Larry's achievement scores. These comparisons help determine the presence and significance of any strengths and weaknesses among his abilities. Larry's oral language skills are average when compared to the range of scores obtained by others at his age level. When compared to others at his age level, Larry's academic skills and his fluency with academic tasks are both within the low average range. His ability to apply those skills falls within the low range. Larry's performance is average in written language and written expression; and low average in reading, mathematics, and math calculation skills. No discrepancies were found among Larry's achievement areas.

While Larry's file contained no previous clinical evaluations – some of his therapists at High Roads did provide clinical updates pertaining to his emotional progress. Larry apparently was receiving group and individual therapy to address his impulsivity, anger management, and interpersonal skills. He also showed markedly divergent personality traits. He was viewed as being capable of earning the top behavioral levels but at times was also capable of being defiant, disruptive, and disrespectful. It was noted that the poor behavior was often done when interacting with peers as it was written, "...he often appears to instigate negativity or disruptive behavior with peers." Over the course of his time at High Roads and his concurrent therapy he was able to master several goals including but not limited to; following directions the first time given; working on not arguing; making good choices and not being disrespectful to staff members.

4

According to Mr. Clark Larry often engages in a number of behaviors that may be adversely affecting other children in the classroom; is considered to be restless and impulsive, has difficulty maintaining his self-control; sometimes engages in rule-breaking behavior, such as cheating, deception, and/or stealing; sometimes has difficulty controlling and maintaining his behavior and mood. Mr. Clark also noted that Larry, does not tend to act in a threatening or intrusive manner; has social and communication skills that are typical of others his age; is able to control his reactions to environmental changes about as well as others his age; reacts to changes in everyday activities or routines in a manner that is typical of others his age; and is able to overcome stress and adversity about as well as do others his age

Larry's drawings also contain several images consistent with insecurity, anxiety, aggression, and a lack of control.

Larry failed to produced a valid record that should ordinarily provide reliable information about his personality functioning. . However, Larry refused to give enough responses so that the Exner scoring system could be utilized. As a result a thorough synopsis pertaining to his personality could not be ascertained. The responses he did give were often the popular responses found when an individual is attempting to be overly conventional. Despite numerous attempts to cajole Larry into giving added responses he often stated, "I don't see nothing else. You can't make me see something if I don't see it!" Several attempts were made following the initial administration of this clinical battery to garner more responses, however, Larry refused to cooperate with said attempts.

In summary, Larry appears to be a *heavily* defended and cautious youth. As a result he may often times behave in a manner in which he *follows* rather than *leads* so as to "fit-in." As he is at a pivotal age in his emotional development as well as burgeoning awareness of sexuality, alcohol, and drugs; he is at risk for putting himself in notable jeopardy should the need to "fit-in" supersede good judgment and learned values.

According to his current school placement, Rock Creek Academy, Larry has met the requirements for graduation and has earned his high school diploma. As a result the following recommendations are based on his post-secondary transition. It is the understanding of this evaluator that Larry is currently living in Miami and will be attending college (Johnson & Wales University) this Fall.

## DIAGNOSTIC IMPRESSIONS:

The following diagnostic impressions are made on the basis of the limited information available from Larry and his teacher and past reports:

| | |
|---|---|
| Axis I | Diagnosis deferred |
| Axis II | None |
| Axis III | None |
| Axis IV | Scholastic concerns |
| Axis V | 70 |

## RECOMMENDATIONS:

Based on these findings the following recommendations are made.

5

1. Should Larry chose to disclose his disability, support services should be provided through his campus disability office.

2. Larry should familiarize himself with the rights afforded to him under the Americans With Disabilities Act.

3. Larry would benefit from individual counseling services to help support his post secondary transition.

4. Should Larry choose to participate in therapy, services should also address areas of security, anxiety, and aggression.

_____

Nadjai B. Plowden, MS, Doctorial Psychology Intern

_____

Supervised by: Martha Ross Ozer, Ed.D, Psychologist
DC Psychology License # PSY 100168

6

# Exhibit 5



District of Columbia Public Schools

Larry Darnell Cooper, Jr.

has completed the course of study prescribed for this

Diploma

Given by authority of the Board of Education of the District of Columbia

June 2007

In testimony whereof we have affixed our signatures

Superintendent of Schools

President, Board of Education

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

Angela Braxton,                                :
                                               :
                                               :
                                               :
           Plaintiff,                          :
                                               :
              v.                               :    Civil Action No. 07-0632 (CKK)
                                               :
                                               :
District of Columbia,                          :
                                               :
           Defendant.                          :
_____:

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

On January 4, 2007, an administrative hearing officer's decision ("HOD") was

issued pursuant to the Individuals With Disabilities Education Improvement Act of 2004

20 U.S.C. §§1400 et seq. ("IDEIA"), concerning student L.C.  Record ("R") p. 2. The

issue presented and resolved was "Did DCPS deny a Free Appropriate Public Education

("FAPE") to the student by failing to conduct and review evaluations in all areas of

suspected disability?" R. p. 3. Based on the evidence submitted and oral presentations at

the hearing on December 22, 2006, the hearing officer denied Plaintiff's request for

independent evaluations and an Individual Education Plan ("IEP") meeting. R. p. 5.

The fundamental factual question in the administrative proceeding was whether

DCPS conducted certain evaluations of the student in response to a student evaluation

plan (SEP) meeting conducted by his school, Rock Creek Academy (RCA).  RCA

recommended a psycho-educational evaluation, clinical evaluation, and vocational

1

evaluation. R. p. 38.  The Plaintiff bore the burden of proof on the issue. <u>Schaffer v.</u>

<u>Weast</u>, 546 U.S. 49 (2005); 5 DCMR 30 § 3030.3.

The hearing officer denied the requested relief, concluding as follows:

> In this case, counsel for the parent has presented no evidence that DCPS
> was invited to the [SEP] meeting at the private placement at [RCA] and
> had notice of the MDT team's recommendations and evaluations. . . . The
> student is attending [RCA] and counsel for the parent has not provided any
> evidence that the student is denied educational benefits in that program. . .
> The 2004 [IDEIA] and its [regulations] requires that 'In matters alleging a
> procedural violation, a hearing officer may find that the child did not
> receive a FAPE only if the procedural inadequacies-(i) Impeded the
> child's right to FAPE; (ii) Significantly impeded the parent's opportunity
> to participate in the decision-making process regarding the provision of a
> FAPE to the parent's child; or (iii) Caused a deprivation of educational
> benefit.'  None of those conditions have been met here. . . .the parent has
> not met his burden of proof that DCPS denied  a FAPE to the student. . . .

R. p. 4.

Neither party in this case disputes that on November 1, 2006 (before the hearing),

a vocational evaluation of L.C. was actually completed, and on January 16, 2007, a

psycho-educational evaluation of L.C. was completed. Exhibit 1.  Thus, in this appeal,

Plaintiff seeks a reversal of the hearing officer's decision, "ordering the Defendant to

fund [a clinical evaluation]" of her minor son L.C. and to convene a meeting following

[that evaluation] to complete certain objectives." Complaint p. 1. Further, Plaintiff seeks

a judgment, "declaring that the District of Columbia Public Schools ("DCPS") violated

the IDEIA and denied L.C. a [FAPE]." Complaint p.1.

On February 15, 2007, a clinical evaluation was also attempted by DCPS, even

though the HOD did not require it, but because L.C. did not provide enough responses to

one of the clinical measures, the test results could not be scored, thus rendering the report

inconclusive. Exhibit 1.  Mr. Nadjai Plowden, MS, who performed the evaluation,

reported that L.C. was uncooperative in providing additional information despite repeated requests to complete the evaluation over the course of several months (February-June 2007). Exhibit 1.  L.C. graduated from RCA with a regular high school diploma on June 22, 2007.

Therefore, due to L.C.'s lack of compliance, a clinical evaluation was never completed and Plaintiff's claims for a clinical evaluation and compensatory education should be denied.

## ARGUMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, (1986); Diamond v.Atwood, 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, (1986). A "genuine issue" is one that will affect the outcome of the action. Celotex, 477 U.S. at 322; Anderson, at 248.

In ruling on a motion for summary judgment, the court must draw all inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. Anderson, 477 U.S. at 255.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  By pointing to the

absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. Id.

**I.      The standard of review for administrative decisions under the IDEIA.**

IDEIA provides for judicial review in state or federal court for "[a]ny party aggrieved by the findings and decision" rendered in a due process hearing.  20 U.S.C. §1415(i)(2)(A).  In reviewing administrative decisions under the IDEIA, the courts will review the administrative record, hear additional evidence upon the request of the parties, and thereafter make a decision based on the preponderance of the evidence. See 20 U.S.C. § 1415(i)(2)(B). "When no additional evidence is introduced in a civil suit seeking review of an HOD, a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record." District of Columbia v. Ramirez, 377 F. Supp. 2d at 67 (citing 20 U.S.C. § 1415(i)(2)(B)).

The court has broad discretion to grant appropriate relief under IDEA, see Sch. Comm. of Burlington v. Mass. Dept. of Educ., 471 U.S. 359, 369 (1985), and the standard of review under the IDEA is less deferential than the traditional "substantial evidence" test used in federal administrative review cases. See e.g. Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988); Kroot v. Dist. of Columbia., 800 F. Supp. 976, 981 (D.D.C. 1992). However, the court should not "substitute its own notions of sound educational policy for those of the school authorities." Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982).  The court must give "due weight" to the administrative decision, but its decision ultimately should be an "independent [one] based on a preponderance of the evidence." Id. at 206-07.  This deference results from Congress' recognition of the "specialized knowledge and experience" required to make

4

complicated educational choices. <u>Rowley,</u> 458 U.S. at 207-08. An HOD is entitled to very little deference unless it is shown to be contrary to the preponderance of the evidence on record. <u>Gellert v. D.C. Pub. Sch</u>, 435 F. Supp. 2d 18, 24 (2006).

The party challenging the hearing officer's determination bears the burden of persuading the court that the hearing officer was incorrect. <u>Angevine v. Smith</u>, 959 F.2d 292, 295 (D.C. Cir.1992); <u>Kerkam v. McKenzie</u>, 862 F.2d 884, 887 (D.C. Cir. 1988); <u>Lyons v. Smith</u>, 829 F. Supp. 414, 417 (D.D.C. 1993).

Accordingly, this Court must give the hearing officer's determination "due weight." In this case, in order to prevail, Plaintiff must show by a "preponderance of the evidence" that the hearing officer was wrong.

## II.    <u>Record evidence supports the hearing officer's decision.</u>

The hearing officer determined that Plaintiff failed to meet the burden of proving: that DCPS denied a FAPE by failing to complete evaluations on the student and convene an Multi Disciplinary Team ("MDT") meeting. R. p. 4. This is supported by the record evidence.

At hearing, Plaintiff alleged that following a September 26, 2006 SEP meeting, DCPS had agreed to perform a psycho-educational evaluation, a clinical evaluation and a vocational evaluation. R. p. 38. Parent further alleged that none of those evaluations was completed and sought an order from the hearing officer that DCPS fund independent evaluations. R. p. 38.

The hearing officer discovered that DCPS had no notice of the September 26, 2006, meeting at RCA because it was not invited, and had no notice of the recommended evaluations. R. p. 3. DCPS argued that Plaintiff did not experience any harm from DCPS

not having conducted the evaluations (the vocational assessment had actually been completed before the hearing on November 1, 2006). R. p. 39; Exhibit 1, 2.

Moreover, the Parent refused to accept the offer made by DCPS at the resolution meeting on November 28th (which took place after the hearing complaint was filed, but before the hearing), in which DCPS offered to complete the evaluations within 60 days. R. p. 26-27.

The HOD found that DCPS had no notice of the September 26, 2006, meeting or its recommendations since it was not invited to the meeting. R. p. 4. Further, the HOD found that since Plaintiff was already attending a full time therapeutic placement at RCA, any procedural violation that may have occurred did not cause any harm to Plaintiff. R. p. 4. Therefore, the hearing officer determined that Plaintiff had not met her burden of proof that DCPS denied L.C. a FAPE. R. p. 4. And that conclusion was fully supported by the record.

**II**      <u>**Even if the hearing officer erred, Plaintiff's claims are moot.**</u>

As of June 20, 2007, Plaintiff's Complaint, became moot because L.C. graduated from high school with a regular high school diploma. Exhibit 5.

The IDEIA implementing regulations provide that "[t]he obligation to make FAPE available to all children with disabilities does not apply with respect to . . . [c]hildren with disabilities who have graduated from high school with a regular high school diploma." 34 C.F.R. §300.102(a)(3)(i). The Tenth Circuit has described this provision as a mootness inquiry. That Court has held that, "[i]f a student has graduated from high school and does not contest his graduation, the case is moot." <u>T.S. v. Indep. Sch. Dist. No. 54</u>, 265 F.3d 1090, 1092 (10th Cir. 2001) (citing <u>Board of Educ. v. Nathan</u>

R., 199 F.3d 377, 381 (7th Cir. 2000)). The Court went on to explain that, "[o]nce a

student has graduated, he is no longer entitled to a FAPE; thus any claim that a FAPE

was deficient becomes moot upon a valid graduation." Id.

   In Kingsberry v. District of Columbia, Civ. No. 03-2378 (D.D.C.)(Mem. Op.

February 7, 2005 p. 4), Judge Urbina stated that

> Courts must evaluate mootness "through all stages" of the litigation in
> order to ensure that a live controversy remains.  21st Century, 318 F.3d at
> 198 (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
> 528 U.S. 167, 191 (2000) and Lewis v. Cont'l Bank Corp., 494 U.S. 472,
> 477 (1990)).  As a result, "even where litigation poses a live controversy
> when filed, the [mootness] doctrine requires a federal court to refrain from
> deciding it if 'events have so transpired that the decision will neither
> presently affect the parties' rights nor have a more-than-speculative
> chance of affecting them in the future.'" (quoting Clarke v. United States,
> 915 F.2d 699, 701 (D.C. Cir. 1990))."

   Also in Kingsbury, the Court stated

> A case is moot when "the issues presented are no longer live or the parties
> lack a legally cognizable interest in the outcome." City of Erie, 529 U.S. at
> 287 (internal quotations omitted).  An intervening event may render a
> claim moot if (1) there is no reasonable expectation that the conduct will
> recur and (2) interim relief or events have completely and irrevocably
> eradicated the effects of the alleged violations.  Pharmachemie B.V. v.
> Barr Labs, Inc., 276 F. 3d 627, 631 (D.C. Cir. 2002); Sellers v. Bureau  of
> Prisons, 959 F. 2d 307, 310 (D.C. Cir. 1992). A case is not moot however,
> so long as any single claim for relief remains viable, as the remaining live
> issues satisfy the case-or-controversy requirement.  Tucson Med. Ctr. v.
> Sullivan, 947 F.2d 971, 978 (D.C. Cir. 1991) (internal quotations and
> citations omitted).  The burden of establishing mootness rests on the party
> raising the issue, and it is a heavy burden.  County of Los Angeles v.
> Davis, 440 U.S. 625, 631 (1979); United States v. W.T. Grant Co., 345
> U.S. 629, 633 (1953); Motor and Equiptment. Mfrs. Ass'n v. Nichols, 142
> F.3d 449, 458-59 (D.C. Cir. 1998)

Id at 4-5.

   The T.S. Court did, however, caution that, "[the mootness rule] applies, . . . only

where a student does not contest his graduation, and where he is seeking only prospective

– rather than compensatory – relief." <u>T.S.</u>, 265 F.3d at 1092. Here, Plaintiff has not

challenged the validity of her son's graduation. In fact, nowhere in her complaint or

motions is L.C.'s graduation even mentioned.  She may have alleged that DCPS did not

conduct the clinical evaluation, but she has failed to indicate how the DCPS' failure to

conduct that evaluation impacts her son's high school degree.  The Tenth Circuit has

explained that where a plaintiff makes a claim for post-graduation relief based on a

procedural error, she must argue that the graduation is invalid in order for the court to

exercise jurisdiction. <u>Id</u>. If the plaintiff does not allege that the procedural error rendered

the graduation invalid, she has insufficiently claimed a loss of substantive benefits, and

the Court cannot hear the purely procedural claim. <u>Id.</u>   Absent any contrary indication,

L.C. has validly graduated from high school with a regular high school diploma and is

therefore ineligible for FAPE. 34 C.F.R. §300.102(a)(3)(i).

     Plaintiff has instead focused solely on a procedural defect – the absent clinical

psychological evaluation that she requested. Plaintiff has failed to show that this

procedural defect resulted in a substantive deprivation such as among other things, an

invalid graduation.  Like in <u>T.S.</u>, where the court denied relief, no substantive

deprivations related to the alleged procedural defects were alleged or found.  <u>T.S.</u> at

1094.  Since Plaintiff has not made that link, she has not made a viable claim substantive

deprivation of a FAPE.

     Moreover, even if a clinical evaluation was to be conducted, and it made special

education service recommendations, the Plaintiff would not enjoy the benefit of those

recommendations having already graduated.  Further, there has been no allegation of how

clinical evaluation results could have changed the determination that L.C. graduate from

H.S. And, no evidence has been submitted that shows Plaintiff's counsel was prevented from automatically obtaining an independent evaluation for his client because of some direct harm resulting from the exam not being performed.[1] Thus, the requested relief at this time would be irrelevant. As such, this Court is without jurisdiction to grant Plaintiff's request for relief.

## CONCLUSION

Plaintiff has not shown by a preponderance of the evidence that the hearing officer's decision in this case was wrong. Thus, the HOD issued should be affirmed. In any event, even if the hearing officer was wrong, L.C.'s own non-compliance with the clinical evaluation and his obtaining a regular high school diploma, have rendered his claims moot. For the foregoing reasons, Defendant's Motion should be granted.

Respectfully submitted,

LINDA SINGER
Attorney General
for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Edward P. Taptich*
EDWARD P. TAPTICH [#012914]
Chief, Equity Section II

---

- [1] The Defendant interprets 34 CFR § 300.503(b) to require a parent who obtains private testing to notify the school that it disagrees with its evaluation and give the school an opportunity 'to show that its evaluation is appropriate' before the parent obtains the private testing. This strained reading of the regulation obviously would leave the parent with no way to challenge a school's evaluation with a reimbursed private evaluation. The plain thrust of the regulation is that the school can later challenge the private testing, and, if it then convinces the administrative reviewers and the district court that its initial evaluation was correct, the parent will not be reimbursed." Hudson v. Wilson, 828 F.2d 1059, 1065 (4th Cir. 1987)

_/s/ Amy Caspari_
AMY CASPARI [#488968]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-7794

September 28, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

Angela Braxton,                          :
                                         :
                                         :
                                         :
          Plaintiff,                     :
                                         :
          v.                             :    Civil Action No. 07-0632 (CKK)
                                         :
                                         :
District of Columbia,                    :
                                         :
          Defendant.                     :
_____:

## DFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1. L.C. graduated from Rock Creek Academy ("RCA"), a full-time special education high school with a regular high school diploma on June 22, 2007. Exhibit 1.

2. L.C. is seventeen years old. Record ("R.") p. 16 and Exhibit 3.

3. L.C. was originally placed at RCA on December 15, 2005 by DCPS. Complaint p. 2.

4. On, September 26, 2006, an (Student Evaluation Plan) ("SEP") meeting took place at RCA regarding L.C.'s special education services. R. p. 3.

5. An MDT team recommended psycho-educational, clinical, and vocational evaluations. R. p. 3.

6. DCPS was not invited to the meeting. R. p. 4.

7. DCPS did not have any notice of the recommended evaluations until the administrative hearing complaint was filed on October 31, 2006. R. p. 4.

1

8. On November 1, 2006, a Vocational Evaluation was conducted by RCA on behalf of DCPS. Exhibit 1, 2.

9. Plaintiff's October 31, 2006, due process complaint ("Complaint") alleged that DCPS failed to complete the evaluations recommended at the September 26, 2006 meeting. R. p. 7.

10. The Complaint alleged that DCPS failed to conduct and review evaluations in all areas of suspected disability. R. p. 7.

11. As relief, the Complaint requested DCPS to fund independent cognitive psychological, clinical and vocational evaluations. R. p. 7.

12. The Complaint also requested DCPS to convene an MDT meeting within 10 days of receiving evaluations, to review the evaluations, revise the IEP, and develop a compensatory education plan. R. p. 7.

13. On November 28, 2006, a resolution meeting was held.  R p. 24-27.

14. The Plaintiff refused to accept DCPS' offer that it would complete the recommended evaluations and hold a meeting to review L.C.'s IEP within 60 days. R. p. 26-27.

15. On December 22, 2006, a due process hearing was convened. R. p. 35.

16. A hearing officer's decision was issued on January 4, 2006, in which the hearing officer found that no evidence had been presented to show that DCPS was invited to the SEP meeting that recommended the evaluations. R. p. 2-5.

17. The hearing officer found that there was no evidence that the student was being denied educational benefits by DCPS. R. p. 4.

18. The hearing officer found Plaintiff failed to meet the burden of proof at the December 22, 2007, hearing that DCPS denied a FAPE by failing to complete evaluations on the student and convene an MDT meeting. R. p. 4.

19. The hearing officer denied the request for relief and dismissed the case. R. p. 5.

20. Despite the HOD, on January 16 and 17, 2007, DCPS conducted a psycho-educational evaluation. Exhibit 1, 3.

21. On February 15, 2007, a clinical evaluation was also attempted. However, because L.C. did not provide enough responses to one of the clinical measures, the test results could not be scored, thus rendering the report inconclusive. Exhibit 1, 4.

22. Nadjai Plowden, MS, who performed the clinical evaluation, reported that L.C. was uncooperative in providing additional information despite repeated requests to complete the evaluation over the course of several months (February-June 2006). Exhibit 1, 4.

23. Due to L.C.'s lack of compliance, a clinical evaluation was never completed. Exhibit 1, 4.

24. On April 25, 2007, Plaintiff filed an appeal of the HOD in this Court seeking a clinical evaluation and compensatory education. Complaint para. 1.

25. On June 22, 2007, Plaintiff graduated from RCA with a regular high school diploma. Exhibit 1.

26. There is no evidence that any educational harm resulted from an incomplete clinical evaluation.  R. p. 4.

Respectfully submitted,

LINDA SINGER
Attorney General
for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


**/s/ Edward P. Taptich**
EDWARD P. TAPTICH [#012914]
Chief, Equity Section II


**/s/ Amy Caspari**
AMY CASPARI [#488968]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-7794

September 28, 2007